**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-3143**

THE ESTATE OF AMY LYNN CROSS,
by and through its personal representative Jennifer Bauder;
V.C., through his guardian, Jennifer Bauder
R.C., through his guardian, Jennifer Bauder
K.C., through her guardian, Lisa McMullen

       Plaintiffs,

v.

TURN KEY HEALTH CLINICS, LLC
TURN KEY HEALTH CLINICIANS, PLLC
TURN KEY HEALTH CLINICS COLORADO, LLC
TURN KEY HEALTH MEDICAL COLORADO, PLLC
ERICA ALCARAZ, individually,
BEATRIZ ORTIZ, individually,
KRISTIN MILLER, individually,
TERESA SIPOLA, individually,
BOARD OF COUNTY COMMISSIONERS, WELD COUNTY;
SHERIFF STEVE REAMS, in his official capacity;

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

    Plaintiffs, by and through their attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complain against Defendants and request a trial by jury as follows:

## I. INTRODUCTION

1.    Amy Cross died as an inmate in the Weld County Jail on September 5, 2021 as a result of deliberate indifference to her known serious medical needs.

2.    Health care workers knowingly disregarded and ignored her worsening condition

and emergent symptoms for over seven hours – symptoms which included chest pain, shaking, erratic agitated behavior, a critically high heart rate, abnormal breathing, being so hot she was laying on the floor shirtless for hours, having seizure like activity, her fingers turning blue, becoming verbally unresponsive, and foaming at the mouth.

3.     Ms. Cross was overdosing on Methamphetamine, but jail health care workers openly disregarded her obvious life-threatening symptoms as she grew increasingly sick and closer to death with each passing hour.

4.     Deputies initiated two medical emergency responses and called Medical Defendants multiple times throughout the day and evening trying to get help for Ms. Cross. However, individual Defendants recklessly assumed her symptoms to be fake without any meaningful evaluation. They pre-determined not to send Ms. Cross to the hospital, regardless of her condition, because she was "acting a fool."

5.     Despite obvious emergent symptoms about which Defendants all admittedly knew, despite deputies calling medical codes and pleading for them to actually help, an ambulance was not called until medical staff could no longer find a pulse because Ms. Cross was already dead.

6.     Ms. Cross died on the floor of her cell from treatable Methamphetamine toxicity. She was 41 years old.

## II.   <u>JURISDICTION AND VENUE</u>

7.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

8.     This case is instituted in the United States District Court for the District of Colorado

pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

9.      Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

10.     The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").

### III.  PARTIES

11.     At all times pertinent hereto, the decedent, Amy Lynn Cross, was a resident of the State of Colorado and a citizen of the United States of America.

12.     The Estate of Amy Lynn Cross was opened in Weld County and the personal representative of her Estate is her sister, Jennifer Bauder.

13.     Plaintiff V.C. is a minor child of Amy Lynn Cross, a resident of the State of Colorado and a citizen of the United States of America.  He brings claims through his guardian, next friend and aunt, Jennifer Bauder.

14.     Plaintiff R.C. is a minor child of Amy Lynn Cross, a resident of the State of Colorado and a citizen of the United States of America.  He brings claims through his guardian, next friend and aunt, Jennifer Bauder.

15.     Plaintiff K.C. is a minor child of Amy Lynn Cross, a resident of the State of Colorado and a citizen of the United States of America.  She brings claims through her guardian, next friend and aunt, Lisa McMullen.

16.     The Defendant Board of County Commissioners, Weld County, Colorado, a/k/a "BOCC" is a governmental entity chartered under the laws of the State of Colorado, located at 1150 O Street, Greeley, Colorado.  Among other things, BOCC, through the Weld County Sheriff's Office ("the Sheriff"), operates the Weld County Jail ("the jail"), located at 2110 O Street, Greeley, CO 80631. Defendant BOCC represents, oversees, and sets policy for Weld County Colorado and contracted with Defendant Turn Key Health Clinics, LLC to fulfill its Constitutional obligation to provide health care to the inmates at the jail.

17.     Defendant Steve Reams, in his official capacity, is the Weld County Sheriff with the address of 1950 O Street, Greeley, CO, 80631. Sheriff Reams is a final policy maker for Weld County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the Weld County Jail.

18.     The Weld County Sheriff and the BOCC are collectively referred to herein as "County Defendants," or "the County."

19.     The County Defendants are proper defendants under 42 U.S.C. § 1983. Although the County has privatized the provision of healthcare services in the jail, it has a non-delegable duty under 42 U.S.C. § 1983 to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, practices, customs, and training by such private contractors.

20.     The intent of the next paragraph is to identify all corporate entities with which Weld County contracted and/or with which subcontracts were made, to provide medical care to the inmates at the jail during the period in question.

21.     Defendant Turn Key Health Clinics, LLC, is a private Oklahoma corporation doing

business in the state of Colorado with its principal address located at 900 NW 12th Street, Oklahoma City, OK, with its registered agent in Colorado at InCorp Services, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601.

22.    Defendant Turn Key Health Clinicians, PLLC, is a private Texas corporation doing business in the state of Colorado with its principal address located at 900 NW 12th Street, Oklahoma City, OK, with its registered agent in Colorado at CT Corporation System, 7700 E Arapahoe Rd, Suite 220, Centennial, CO 80112.

23.    Defendant Turn Key Health Clinics Colorado, LLC is a private Delaware corporation doing business in the state of Colorado with its principal address located at 900 NW 12th Street, Oklahoma City, OK, with its registered agent in Colorado at CT Corporation System, 7700 E Arapahoe Rd, Suite 220, Centennial, CO 80112.

24.    Defendant Turn Key Health Medical Colorado, PLLC is a private Colorado corporation doing business in the state of Colorado with its principal address located at 900 NW 12th St, Oklahoma City, OK, with its registered agent in Colorado at CT Corporation System, 7700 E. Arapahoe Road, Suite 220, Centennial, CO 80112.

25.    Defendants Turn Key Health Clinics, LLC, Turn Key Health Clinicians, PLLC, Turn Key Health Clinics Colorado, LLC, and Turn Key Health Medical Colorado, PLLC are collectively referred to as "Turn Key" or "Turn Key Defendants."

26.    Turn Key Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates. Upon entering into contracts or subcontracts to provide medical and/or other services to Weld County inmates, Turn

Key assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

27.     Turn Key is also properly sued for its own negligence and the negligence of its agents and employees under state law.

28.     Weld County Defendants and Turn Key are collectively referred to herein as the "Entity Defendants."

29.     At all times relevant hereto, Defendant LPN Erica Alcaraz was a citizen of the United States and a resident of Colorado. Defendant Alcaraz was an agent, employee, and/or subcontractor of Turn Key Defendants, and was responsible for providing medical care to Amy Cross during her detention. At all material times, this Defendant was acting under color of state law.

30.     At all times relevant hereto, Defendant RN Beatriz Ortiz was a citizen of the United States and a resident of Colorado. Defendant Ortiz was an agent, employee, and/or subcontractor of Turn Key Defendants, and was responsible for providing medical care to Amy Cross during her detention. At all material times, this Defendant was acting under color of state law.

31.     At all times relevant hereto, Defendant RN Kristin Miller was a citizen of the United States and a resident of Colorado. Defendant Miller was an agent, employee, and/or subcontractor of Turn Key Defendants, and was responsible for providing medical care to Amy Cross during her detention. At all material times, this Defendant was acting under color of state law.

32.     At all times relevant hereto, Defendant NP Teresa Sipola was a citizen of the United States and a resident of Colorado. Defendant Sipola was an agent, employee, and/or subcontractor

of Turn Key Defendants, and was responsible for providing medical care to Amy Cross during her detention. At all material times, this Defendant was acting under color of state law.

33.     Defendants Alcaraz, Ortiz, Miller, and Sipola, are referred to herein as "Individual Defendants."

## IV.   STATEMENT OF FACTS

34.     Ms. Cross was booked into the Weld County Jail on September 3, 2021 for drug related charges. She was scheduled to be transferred to work release on September 7, 2021 but instead died of drug toxicity in the early morning of September 5, 2021.

35.     A common and recurring problem among inmates in jails generally, and the Weld County Jail specifically, is drug addiction and its related medical conditions – withdrawal and overdose.

36.     Evaluating and addressing the needs of inmates with a recent history of drug use, as well as associated medical conditions, is a usual and recurring task for health care workers in the Weld County Jail.  "Health care workers," as used herein, means Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), and Nurse Practitioners ("NP").

37.     During this time period, the Weld County Jail had serious problems with illicit drugs being smuggled into the jail and traded among the inmate population.  In fact, three people in the jail overdosed on contraband drugs in the week prior to Ms. Cross's incarceration.  It was thus well known to jail staff that inmates had access to illegal drugs within the jail.

38.     All reasonable health care workers are aware that drug overdoses are common among drug users. Fortunately, overdoses are frequently treatable with medical intervention. If untreated, however, drug toxicity can be fatal.

39. Given the significant risk of serious injury and death associated with overdoses, every jail health care worker must be able to recognize the signs and symptoms of drug overdose, including specifically methamphetamine toxicity.

40. Methamphetamine toxicity causes a host of life-threatening symptoms, which include: erratic and overly animated behavior, muscle jerking, significant and difficult to control movement and fidgetiness, increased heart rate, increased temperature, increased breathing, sweating and dehydration, and chest pain. As it proceeds, it can cause seizures, strokes, heart attacks, organ damage, constricted blood vessels, blood loss to extremities, muscle damage, and death. People in acute methamphetamine toxicity must be hospitalized for drug induced sedation, intubation, rehydration, treatment with benzodiazepines and medications to reduce blood pressure, airway management and provision of fluids and oxygen. It is common in such cases that the patient must be medically paralyzed and sedated to the point where they can receive treatment.

41. From day one the health care workers in the jail understood that Ms. Cross had a history of drug abuse and was likely to have overdose or withdrawal related medical issues.

42. In fact, Ms. Cross smuggled a bag of methamphetamine inside her body into the jail undetected.

43. While Ms. Cross did not disclose that she had smuggled drugs inside of her, she did admit during her intake screening on September 3, 2021, that she regularly used illegal drugs.

44. Specifically, during the intake screening she told Defendant Beatriz Ortiz that she was a frequent user of opiates, benzodiazepines, and IV drugs. She reported being a current drug user and having done Methamphetamine and Xanax off and on for the past two weeks. She told RN Ortiz that she had done illegal drugs the day of booking and that she took Fentanyl, "too many

daily."

45.     Ms. Cross also told Ms. Ortiz that she had previously experienced withdrawal symptoms, including hot/cold sweats, nausea, a history of seizures, and that she had a host of other mental health problems.

46.     Per Turn Key protocol, admitting to experiencing withdrawal symptoms upon stopping drugs requires an "immediate evaluation by a provider" but no such immediate provider referral or evaluation took place.

47.     RN Ortiz noted that Ms. Cross appeared to be under the influence of fentanyl and to be "irritable." She put in orders for withdrawal protocols and medications, but also put the medications on hold because Ms. Cross would not provide a urine sample when requested.

48.     Ms. Cross was placed on COWS (Clinical Opiate Withdrawal Scale) periodic evaluations for drug withdrawal, which required evaluation of her clinical presentation, frequent checks and vital signs measurements.

49.     Upon initial COWS check, Ms. Cross appeared agitated, fidgety, had chills and an elevated pulse. Ms. Cross did not receive the regular and required COWS checks or vitals thereafter.

50.     Sometime between 4:00 and 4:45 p.m. on September 4, 2021, Ms. Cross had an obvious worsening in her condition and complained of chest pain.

51.     Recognizing the seriousness of a complaint of chest pain and Ms. Cross's condition, Deputy Secosky came to transport her to the medical unit by wheelchair at around 4:45 p.m.

52.     During transport, she was erratic and animated. She alternatingly was skipping along the hall and squatting down, flapping her knees together and grabbing her head.

53.     Deputy Andrew Wilson, who knew Ms. Cross from past interactions, saw her sitting on the floor and saying she felt like she was going to have a seizure. Deputy Wilson helped Deputy Secosky transport Ms. Cross to medical.

54.     Ms. Cross was breathing fast, trembling and having tremors, and said she felt like she was going to vomit.  Deputies laid her on her side on the floor of the hall and instructed her on breathing.

55.     At around 4:49 p.m., Deputies Wilson and Secosky called the first Medical Code 5 for Ms. Cross.

56.     A Medical Code 5 is a declaration of a medical emergency and the most emergent medical code the staff can call.  It is called when staff determine that an inmate requires immediate medical attention – it prompts all available nursing and security staff to respond to that inmate's location.

57.     Deputies Michael Recor, Trevor Alm, Rodney Miller, and James Riddle responded to this Medical Code 5.

58.     Medical staff Kristen Miller, Jane Shoenecker, Kyrie Kuhn, Brittanie Flores, and Kat Gigliotti also responded to the emergency code.

59.     Ms. Cross was repeatedly yelling: "I'm burning up and need to go to the hospital and I have chest pain."

60.     Defendant RN Miller found Ms. Cross to have a pulse of 152, which is incredibly abnormally high. She also had a high blood pressure, elevated respirations of 20, and a low pulse oxygen level.

61.     Throughout this interaction, Ms. Cross was animated, jerky, and her legs were

shaking.

62.     Defendant Miller also charted that Ms. Cross was diaphoretic and shaking in the wheelchair all the way to the medical office.  Diaphoresis means being sweaty or clammy; it is an emergency symptom when combined with chest pain and a high pulse.

63.     Ms. Cross arrived in the medical unit at approximately 4:58 p.m.

64.     Ms. Cross told RN Miller that she could not urinate.

65.     RN Miller charted that she could not complete an EKG because Ms. Cross "would not" hold still.

66.     RN Miller called Defendant Teresa Sipola, NP.  NP Sipola instructed RN Miller to catheterize Ms. Cross to get a urine sample "to ensure she was unable to urinate as patient had claimed she 'could not pee' multiple times." NP Sipola also ordered IV fluids be started.

67.     Ms. Cross was agitated, "fidgety," unable to hold still, and "refused" to allowed RN Miller to catheterize her. NP Sipola authorized a dose of withdrawal medications, which had previously been withheld absent a urine sample.

68.     Ms. Cross was given medications, which she spit out all over the table.  She pulled out her IV.

69.     RN Miller's "assessment" of Ms. Cross's condition was "risk for fluid volume deficit, Risk for falls, Inability to cope."

70.     Throughout this examination, Ms. Cross complained of chest pain, inability urinate, feeling like she was burning up, was highly fidgety and obviously agitated. She yelled that she needed to go to the hospital.

71.     Ms. Cross did not have the capacity to refuse any care and was begging to go to the

hospital. She was showing both objective and subjective signs of a serious medical condition.

72.     All of this behavior was treated by RN Miller and NP Sipola as disobedience, charting that she was "refusing" to cooperate, even though she was agitated, tachycardic (high heart rate), and tachypneic (high respiratory rate). Despite these objective signs of medical distress, RN Miller became angry at Ms. Cross and went on a "tirade" in the medical unit.

73.     NP Sipola and RN Miller knew that Ms. Cross was exhibiting textbooks signs and symptoms of methamphetamine toxicity, overdose, and cardiac distress. She was obviously agitated and irritable, restless, having chest pain, high heart rate, breathing harder, feeling extremely hot, unable to urinate, and complaining she was having a seizure.

74.     All reasonably trained health care workers know that the classic signs and symptoms of stimulant overdose include anxiety, restlessness/hyperactivity or agitation, chest pain, very high body temperature, hallucinations, psychosis/paranoia, seizures, rapid or labored breathing, irregular or fast heartbeat, high or low blood pressure, changes in ability to urinate, and stomach pain.

75.     NP Sipola and RN Miller knew at the time that Ms. Cross was exhibiting emergency symptoms that required immediate higher-level assessment and hospitalization.

76.     Having determined an EKG is necessary to evaluate emergency symptoms like those exhibited by Ms. Cross, it was reckless to dismiss those emergency symptoms without obtaining an EKG or higher-level assessment.

77.     Defendants Miller and Sipola completely abdicated their role as gatekeepers and recklessly did not hospitalize Ms. Cross.  They did this despite knowing they had not even obtained an EKG, one of the very few tools available at the jail, and that they had done nothing to rule out

serious causes for her abnormal vitals and medical symptoms. They did this knowing that they could not treat or assess Ms. Cross, who needed to be sedated to receive assessment and treatment that was outside of the jail's ability. They did this knowing that Ms. Cross was at serious risk of bodily injury or death without assessment and treatment.

78.     RN Miller simply sent Ms. Cross back to housing.

79.     Ms. Cross told Defendant Miller that she needed to be 'on a level,' meaning a suicide watch level, adding "but not a level one in case something happens to me and I can't do anything about it." Being on a suicide watch meant that deputies in Nora pod would check on her at regular intervals. Ms. Cross was clearly worried about her medical condition and asking to be checked on frequently.

80.     RN Miller put Ms. Cross on a suicide watch in Nora pod and made no plan for follow up medical evaluations.

81.     Just before 6:00 p.m., Deputies Wilson and Secorsky transported an "obviously agitated" and erratic Ms. Cross to Nora Pod.

82.     During the transportation, Ms. Cross was fluttering her legs, extending her arms, fanning her face, flipping her hair, jittery, and shaking.  At one point she leaned forward out of the wheelchair, knelt on the floor, and complained she was hot before suddenly sitting up and getting back in the chair.

83.     At another point during the transport, she suddenly jolted forward out of the wheelchair and onto the floor, her legs were shaking as though she was seizing, and she told deputies she was going to have a seizure.

84.     As soon as she arrived at the cell, she took of her shirt, said she was hot, and

alternated between sitting and laying on the floor.

85.     Defendant Erica Alcaraz, LPN came on shift around 6:00 p.m. and was the nurse responsible for Nora Pod on the evening of September 4th.

86.     During shift change, Defendant Miller told Defendant Alcaraz that a medical code had been called for Ms. Cross for some "unknown issue" where she had toppled out of a wheelchair earlier in the day, and that Ms. Cross had refused to take medications or talk to nursing.

87.     RN Miller explained to LPN Alcaraz that after the deputies called their first Medical Code 5, Defendant NP Teresa "Terry" Sipola decided that the medical team was not going to send Ms. Cross to the hospital that day or night regardless of how sick she became.  Specifically, LPN Alcaraz reported to investigators that Defendant Miller's exact words were: "**She is acting a fool, and Terry said we are not sending her out**."

88.     NP Sipola outrageously predetermined that Ms. Cross was not going to the hospital while knowing she had not actually assessed her, there was no one in the jail with the ability to diagnose what was wrong, and that even the ordered diagnostic tests had not been completed.

89.     This medical team thus actively conspired to prevent Ms. Cross from receiving any medical attention for her known emergency regardless of how sick she became.

90.     Deputy Kendra Betz was assigned to Nora Pod, or "N" Pod from 6:00 p.m. on September 4th to 6:00 a.m. on September 5th.

91.     When Deputy Betz came on shift, she was briefed by Deputy Hunter Aslin that Ms. Cross was inside Cell 4 on five-minute suicide watch checks.

92.     Deputy Aslin told Deputy Betz that Ms. Cross was having "seizure like activity," but that medical staff had concluded that the seizures were not "real."

93.     He also told Deputy Betz that the medical team had instructed deputies not to call any more Medical Code Fives for Ms. Cross, but instead to just call them directly, thus preventing deputies from airing emergency codes that would cause a larger response from jail staff who may not be following this deliberately indifferent plan to withhold medical treatment.

94.     Deputy Betz could immediately see that Ms. Cross was "super out of it." She was behaving strangely, having seizure like activity, "flailing in her cell," and not responding to Deputy Betz.

95.     Given Ms. Cross's medical condition, Deputy Betz called LPN Alcaraz to verify that Medical had actually instructed deputies not to call medical emergencies. LPN Alcaraz confirmed, stating deputies should not call an emergency "**unless she hit her head or was not breathing**."

96.     Sometime around 6:30 p.m., Deputy Betz saw that Ms. Cross was spitting up "brown mucusy stuff" and "shaking on the floor."

97.     Deputy Betz called LPN Alcaraz again and reported these symptoms. Nurse Alcaraz did not respond immediately to these serious medical symptoms, instead telling Deputy Betz that she would check on her during the scheduled medication administration pass ("med pass").

98.     Around 7:08 p.m. Defendant Alcaraz came to N Pod for med pass.

99.     When LPN Alcaraz arrived at Ms. Cross's cell, she was laying on the floor with her eyes closed, topless and shaking. LPN Alcaraz was joined in the cell shortly thereafter by Defendant Beatriz Ortiz, RN.

100.    LPN Alcaraz had to "manually open her eyes" at which time Ms. Cross was visually

responsive, but unable to verbalize.

101.    LPN Alcaraz noted that Ms. Cross's breathing was tachypneic (meaning fast), an abnormal vital sign, but falsely charted that she "began normal breathing patterns."

102.    In response to nursing questions, Ms. Cross was just "grunting."

103.    LPN Alcaraz noted that Ms. Cross was "gathering spit in her mouth and making bubbles," and "refusing to speak to medical and closing her eyes tightly."

104.    LPN Alcaraz and RN Ortiz recklessly and unfairly concluded Ms. Cross was "refusing to speak to medical" and purposely "closing her eyes tightly," rather than respond to the emergency symptoms that their patient was unable to talk or open her eyes. These nurses told an unresponsive Ms. Cross that she could not have any withdrawal medications without providing a urine sample, and then baselessly concluded that she would not "cooperate."

105.    Defendants Ortiz and Alcaraz did a cursory assessment of Ms. Cross while she was non-interactive and grunting.  They observed seizure like activity, brown mucusy stuff coming out of her mouth, and abnormal breathing. They then concluded, recklessly and outside the scope of their licensure, that Ms. Cross was "fine" and "stable."

106.    These nurses falsely told Deputy Betz that Ms. Cross's vitals were fine. It is medically extremely unlikely, and perhaps impossible, that Ms. Cross's vital signs were normal at that point, given her previous abnormal vital signs, her worsening symptoms, and her death just hours later.

107.    Outrageously, they did not deviate or even revisit their plan not to send Ms. Cross to the hospital, telling Deputy Betz to just make sure that she "kept breathing" and "doesn't start to choke on the fluid that she keeps spitting up."

108.     They left Ms. Cross half naked on the floor of her cell with brown fluid coming out of her mouth.

109.     All reasonable health care workers are aware that chest pain, erratic behavior, high heart rate, difficulty breathing, hot body temperature, foaming at the mouth, and being verbally unresponsive are serious symptoms that must be immediately medically evaluated by a doctor.

110.     Nurses Alcaraz and Ortiz continued the medical staff's deliberately indifferent practice of diagnosing symptoms as being faked or intentional acting out rather than real or medically significant, even in the face of mounting objective proof. Ms. Cross was not gathering spit in her mouth -- she was foaming at the mouth.  She was not shaking her legs -- she was seizing or having myoclonic jerking.  She was not refusing to speak or cooperate -- she was in a medical crisis.

111.     Ms. Cross was obviously in the throes of a worsening medical emergency and needed desperately to be hospitalized. Instead, acting with extreme deliberate indifference, Defendants Ortiz and Alcaraz chose not to obtain medical care and instead to follow the deliberately indifferent plan of refusing to "send her out."

112.     At around 8:00 p.m., Deputy Betz asked Deputy Michael Beaman to do her rounds, specifically asking him to check on Cross.

113.     When Deputy Beaman got to Cross's cell, she was laying on the floor, shirtless. She "had brown gunk all over her face and was foaming at the mouth." He thought she looked like she was choking.

114.     Seeing this obvious medical emergency, Deputy Beaman called a Medical Code 5.

115.     This was the second medical emergency called for Ms. Cross that day.

116.    Deputy Beaman went into her cell and rolled her over.  He asked her to try to spit out what was in her mouth, which she tried to do. Deputy Beaman saw that Ms. Cross was not "verbal but was grunting or mumbling like she understood and was trying to respond."

117.    Medical staff and deputies responded to the Medical Emergency call, including Defendants Alcaraz and Ortiz.

118.    Deputy Beaman started to clean her face.  Ms. Cross tried to help but it was obvious that she wasn't strong enough so he took the towel back and did it himself.

119.    Meanwhile, medical staff took vitals and callously continued to ask this critically ill woman to provide a urine sample.

120.    Deputy Beaman asked medical staff what the brown gunk on her face was and they baselessly concluded that it was likely the medications she had been given hours earlier.

121.    During this Medical Code 5 response, Ms. Cross was not responding to commands, sweating heavily, and foaming at her mouth.

122.    Nurse Alcaraz told investigators that during this medical emergency, Ms. Cross was shaking, "blowing bubbles or intentionally spitting" and "refused to open her eyes."

123.    Nurse Ortiz told investigators that Ms. Cross was throwing up and looked "horrendous," but claimed that her vital signs were "normal."  She also stated that she noticed a "brown tinge" in her saliva, but that it did not "appear to be blood or anything concerning."

124.    Ms. Cross who was obviously critically ill, foaming at the mouth, sweating, unresponsive, spitting up unidentified brown fluid, unable to open her eyes, too weak to wipe her own face and looking "horrendous," was dismissively described by LPN Alcaraz as not seeming any worse than she had a few hours earlier.

125.    By 8:15 p.m., medical staff again left Nora Pod, leaving Ms. Cross exactly as they found her, and once again, recklessly 'cleared' her to remain at the jail.

126.    At or before 8:39 p.m., LPN Ortiz relayed this crisis to NP Sipola, who merely prescribed anti-nausea medication and consciously chose to persist in her outrageous plan "not to send her out," regardless of the severity of symptoms.

127.    NP Sipola never diagnosed Ms. Cross or the cause of critical her symptoms.  Nor could she -- she had never seen or assessed her.

128.    NP Sipola, Nurse Alcaraz and Nurse Ortiz all knew that anti-nausea medicine could never treat, let alone cure, any underlying condition.

129.    Delaying evaluation and treatment for an inmate in this condition evidenced a wanton disregard to Ms. Cross' health and safety. Defendants continued to deprive Ms. Cross of obviously critically needed care, thereby knowingly risking her life.

130.    Deputy Betz became increasingly concerned about Ms. Cross's deteriorating condition and medical staff's utter lack of response.  She continued to check on Ms. Cross, who was "laying on the floor foaming from the mouth and breathing odd."

131.    During these checks, Deputy Betz saw that Ms. Cross's "fingers were turning blue."

132.    Deputy Betz relayed this obviously emergent symptom to LPN Alcaraz, who did not respond to the cell.  Instead, she callously told Deputy Betz that her fingers were turning blue because "she is cold" and "laying on the cold floor is making her cold."

133.    LPN Alcaraz then called back a little later and asked if Ms. Cross was "still breathing weird," telling Deputy Betz that "this could be another reason why [her fingers] are turning blue," that breathing funny like she was "would cause a lack of oxygen."

134.     Given that Ms. Cross was having altered breathing and now her extremities were changing color, Deputy Betz understandably asked if LPN Alcaraz was going to come check on her, but she said no, "that it should be fine," and just instructed Deputy Betz "to keep monitoring her and notify them if it got worse."

135.     Obviously, if Ms. Cross's fingers were turning blue from lack of oxygen (as Nurses Alcaraz and Ortiz concluded), that was yet another obvious medical emergency. Whatever the reason that her fingers were changing color, the treatment is beyond the capabilities of the jail to put it mildly, and certainly nothing about continuing to be checked on every five minutes was going to help.

136.     It is beyond reckless to conclude that a patient's fingers turning blue is "fine." Any person, let alone a medically trained person, knows that a patient who is laying on the floor, breathing abnormally, foaming at the mouth, spitting up brown fluid, too weak to wipe their own face, erratic and shaking, complaining of chest pain and intense heat, with a fast heart rate and blue fingers, unquestionably needs to go to the hospital.

137.     All reasonable health care workers (indeed, lay people) are aware these symptoms can cause serious injury and death. Any person, medically trained or otherwise, would see that basic human decency required immediate hospitalization.

138.     Between approximately 9:00 p.m. and 10:00 p.m., Deputy Betz could no longer tolerate the "the lack of attention from medical staff" to Ms. Cross's "worsening condition," and decided to escalate the issue up the security chain of command.

139.     Deputy Betz actually spoke to three different sergeants about her concerns: Sergeant Recor, Sergeant Marquez, and Sergeant Gatzke.

140.     Deputy Betz called Sergeant Recor and told him that "she asked medical staff to check Cross, but they refused, saying they did so earlier."  Sergeant Recor told Deputy Betz that she had three options: to trust medical staff, to call medical to the Pod again, or to call another Code 5.

141.     Deputy Betz told Sergeant Marquez that she needed advice given Ms. Cross's obviously deteriorating and worsening condition because "everyone was told not to call a medical code (5)" and to instead call medical staff directly. Sergeant Marquez told Deputy Betz to document her observations.

142.     Deputy Betz concerns persisted such that she contacted Sergeant Gatzke sometime between 10:15 p.m. and 10:30 p.m. Sergeant Gatzke advised Deputy Betz that she could choose between trusting medical staff, calling a Medical Code, or call a different individual nurse.

143.     At that point, Deputy Betz called the medical unit and asked Nurse Ortiz, a higher-level nurse, to come see Ms. Cross herself given LPN Alcaraz's repeated dismissals and lack of attention.

144.     RN Ortiz merely responded that "she would head that way but was currently with another inmate on an unrelated issue."

145.     However, RN Ortiz did not respond to the cell. Instead, she sent LPN Alcaraz again.

146.     Nurse Alcaraz finally arrived in the cell around 11:15 p.m. By that point, Amy Cross was nearly dead.

147.     Ms. Cross had a critically low blood pressure of 70/52. She was "still breathing" but her "breathing was shallow."

148.     *Even still*, Nurse Alcaraz did not immediately call an ambulance. With shallow

breathing, brown tinged spit, a barely discernible blood pressure, and clearly losing blood or oxygen to her extremities as they changed color, Nurse Alcaraz held to the pre-determined course and did not call for an ambulance.

149.    She did not even call a medical emergency.  Instead, she merely called Nurse Ortiz for "assistance."

150.    Nurse Ortiz took her time in coming to "assist" with this near dead patient, arriving some six minutes later at 11:24 p.m.

151.    Ms. Cross did not have a pulse because she had died on the floor.

152.    Outrageously, despite her heart having stopped, Defendant medical staff still did not call an ambulance for *another six minutes*.

153.    It even took these nurses *another four minutes* to call a Medical Code 5 and begin CPR.

154.     Sergeant Recor responded to the emergency code and observed Ms. Cross to be "unresponsive," with her "face wrinkled and discolored," and "her eyes were sunken and rolled back."

155.    Ms. Cross was still topless on the floor and there was a "brown substance that flowed from her mouth along her left cheek to her ear," and on "her left eye and temple and left forehead" and there was white "foam on floor" and in her hair.

156.    Paramedics arrived at 11:40 p.m.

157.    Amy Cross was pronounced dead at 12:01 a.m.

158.    Despite two previous medical emergencies being called by deputies at 4:49 p.m. and around 8:00 p.m., despite Deputy Betz doing five minute checks and repeatedly pleading with

medical to help Ms. Cross many times throughout the day and evening, despite their own awareness of her seizures, foaming at the mouth, high pulses, high respirations, erratic behavior, being so hot she wouldn't keep her shirt on, fingers turning blue, and brown tinged fluid coming out of her mouth hours earlier, this medical staff lied to paramedics to cover up their own derelict wrongdoing.

159.    Thus, Defendants Alcaraz and Ortiz falsely and outrageously told paramedics that Ms. Cross "did not have any complaints throughout the day prior to this" and that her medical problems started twenty minutes earlier, at 11:20 p.m.

160.    Ms. Cross died from "acute methamphetamine toxicity."

161.    On autopsy, Ms. Cross was found to have a bag of methamphetamines inside her body that had broken open.

162.    Amy Cross was only 41 years old when died. Her short stay in jail turned into a death sentence through the deliberate indifference, negligence, and willful and wanton conduct of Individual Defendants and Turn Key.

163.    The Estate of Amy Cross has suffered significant damages, entitling it to recover its compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, pain and suffering before death, loss of earnings based upon the probable duration of her life, and other damages, all in amounts to be proven at trial.

164.    The Estate is entitled to recover for the value of the Amy Cross's lost life and lost pleasure of living, including the economic, moral, and philosophical value society places on that life, including her enjoyment of the activities of life.

165.    The Estate of Amy Cross is entitled to compensation for all her pre-mortem

suffering. The final minutes of Amy Cross life were intensely dominated with suffering including her consciousness of impending death.

166.    Amy Cross was much loved by her three children, V.C., R.C., and K.C. Although they lived with Amy's siblings and father at the time she passed away, each of Ms. Cross's children maintained a close relationship with her and have been devastated by her death. While Ms. Cross's struggles with substance abuse affected her relationships with her children, family, and friends, she loved them very much and they loved her.

### Allegations Relating to *Monell* Liability

167.    At all times relevant hereto, the County contracted with Turn Key to provide medical care and services to detainees and inmates at Weld County Jail.

168.    Turn Key maintained constitutionally deficient policies at Weld County Jail and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of inmates' serious medical needs.

169.    It is a common and recurring need in all jails that inmates have medical conditions that require timely transport to hospitals for higher level assessment and higher acuity care.

170.    Evaluating and addressing the needs of inmates with symptoms of acute intoxication, chest pain, abnormal vital signs, seizures, mental status changes, as well as associated medical conditions, is a usual and recurring task for health care workers in the Weld County jail.

171.    Individual Defendants abandoned Ms. Cross while she was suffering from an obvious medical crisis, recklessly determining that they weren't going to send her to a hospital no matter how sick she became, causing her to die of a treatable drug overdose. They did not obtain higher level evaluation and arrogated to themselves medical decision making that was recklessly

outside of their scope of practice for their licensure.

172.    Even after Ms. Cross' fingers turned blue, Individual Defendants continued to follow their deliberately indifferent plan of refusing to provide emergency treatment. They all did this pursuant to Turn Key's custom of disregarding subjective complaints and presuming inmates are malingering and faking their medical complaints.

173.    Each of the Individual Defendants violated Ms. Cross's constitutional right to be free from deliberate indifference to her medical needs in essentially the same unconstitutional manner – failing to treat her significant medical problems, ignoring life-threatening symptoms, dismissing symptoms as faked, and failing to refer her for higher level evaluation and treatment despite knowing that failing to do so put her at significant risk of serious illness or death.

174.    On information and belief, all Individual Defendants still work for Turn Key and received no discipline, despite specific complaints by deputies about their conduct with respect to Amy Cross and an investigation conducted by the Greeley Police Department that revealed many of the allegations contained herein. This pattern, including all Defendants following the same unconstitutional plan to not send Ms. Cross out and disallowing emergency Medical Codes to be called, and the express toleration by Turn Key of the same, evinces the Turn Key's custom, policy, or practice of deliberate indifference.

175.    As a for-profit medical provider, Turn Key maintains a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, failing to order diagnostic testing, failing to timely send patients to the hospital in order to save money and increase profits, understaffing, and using nurses to practice medicine recklessly outside their scope.

176.    In many of their contracts, Turn Key agrees to cover all costs, up to a limit, for

inmates who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

177.    In its bid for the Weld County contract, Turn Key made absolutely clear that a core tenet of their business and pricing model is to reduce costs, and increase their profits, by reducing "unwarranted" offsite costs:

> Turn Key has concrete evidence of how our simplistic approach has dramatically reduced unwarranted offsite costs, specifically at facilities that were previously managed by Armor. According to statistics maintained by the facility, ***Tulsa County experienced a 77% reduction in monthly Emergency Room transfers and a 35% reduction in monthly hospitals days*** within the first few months of Turn Key replacing Armor's program.  To further highlight our success, ***the annual offsite expenditures have remained well below the established Aggregate CAP since we started our contract.  This is an accomplishment that had not been realized for at least 4 years prior to Turn Key taking over the program!***

> In addition to the cost savings associated with fewer hospital claims, Tulsa County experienced additional cost savings in the form of the reduced need for offsite security personnel.  On average, TCSO was able to reallocate an average of 585 man-hours per month to other security functions as opposed to ER and hospitalization security duty.  Even with a conservative estimate, ***we believe our program allowed for an annual reduction of more than $175,000.00 of excessive offsite security pay.***

178.    In its $4.5 million dollar contract with Weld County, Turn Key agreed to cover only $125,000 in offsite and specialty care costs per year, despite understanding there would be, on average, more than 800 detainees in their care.

179.    At the time Turn Key bid on the Weld County contract, the jail had 959 beds and was in the process of constructing a new wing, to be completed by the end of 2020. The new wing allowed for 381 additional beds – bringing the Jail's capacity to 1,340 and making Weld County Jail Turn Key's third largest facility

180.    Accordingly, Turn Key had a strong financial incentive not to send seriously ill patients to an outside health care provider.

181.    Prior to Ms. Cross's death, there was a well-known widespread pattern and practice of deliberately indifferent medical care at Turn Key facilities.

182.    Turn Key's custom, policy or practice of deliberate indifference regarding assessing and treating serious medical needs is further evidenced the surfeit of deaths and serious injuries in their jails revealed through the many related lawsuits.

183.    Because Defendant Turn Key is a large company with a shameful record of providing constitutionally inadequate medical care at institutions across the Oklahoma-Arkansas region, there are a plethora of examples from other facilities demonstrating Turn Key's culture, custom, policy, and practice of deliberate indifference to the serious medical needs of their prisoner-patients. In the four years preceding the Weld County contract award, Turn Key was named as a defendant in at least fifty lawsuits alleging inadequate medical care in Oklahoma and Arkansas alone.

184.    When Turn Key contracted to provide medical services at Weld County Jail in December 2019, the company had already been named as a defendant in at least a hundred lawsuits alleging they provided inadequate medical care to inmates. For example:

185.    In 2009, Lacee Danielle Marez was booked into the Cleveland County Jail for missing a court appearance. During a tussle with jail staff Ms. Marez, only 21 years old, struck her head on a concrete floor and suffered a traumatic brain injury. Over the next several days Ms. Marez repeatedly asked for medical treatment, began vomiting, urinating on herself, and laying lethargic in her bed. ESW Correctional Healthcare (a previous iteration of Turn Key Health

Clinics, LLC) staff ignored Ms. Marez's requests for medical attention and obviously serious symptoms. Medical staff abandoned Ms. Marez in a holding cell for three days, where she slipped into a coma and suffered a heart attack. Ms. Marez lived in a vegetative state for several years but eventually passed away. In 2014, Turn Key paid a confidential amount to settle a federal civil rights lawsuit related to this incident.

186.     Curtis Gene Pruett was only 36 years old when he died in a holding cell at Cleveland County Jail in October 2011 after staff ignored his repeated pleas for emergency medical attention. Mr. Pruett told medical staff that he had high blood pressure and was in severe pain. Surveillance video showed Mr. Pruett doubled over and clutching his chest, but rather than assess Mr. Pruett or refer him to a higher-level caregiver, a nurse accused Mr. Pruett of faking his condition. Mr. Pruett subsequently died of a heart attack. Turn Key settled a lawsuit related to the incident in 2014.

187.     While detained at the Cleveland County Detention Center in November of 2014, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection," and underwent emergency brain surgery. Mr. Autry underwent a series of other operations and procedures to place a feeding tube, insert a

tracheal tube, and replace a cranial monitoring probe. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

188.    In June 2016, Turn Key medical staff at Garfield County, Oklahoma Jail did nothing to intervene while Anthony Huff, who was experiencing delusions and hallucinations, was kept in a restraint chair for more than 55 hours. Mr. Huff was ultimately found unresponsive in the chair and pronounced dead. After a federal wrongful death lawsuit was filed on Mr. Huff's behalf, two Turn Key nurses and various jail staff were each charged with felony second-degree manslaughter. In October 2019, Garfield County paid $12.5 million to settle the case, to which Turn Key contributed a confidential amount.

189.    Anthony Kade Davis also died in June 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. In the days leading up to his death Mr. Davis was screaming, shouting that he was in pain, and pleading for assistance. He was known to be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause. A federal civil rights lawsuit arising from Mr. Davis's death was filed in 2017.

190.    Michael Edwin Smith became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition

that can cause permanent paralysis if untreated. When he told the Turn Key-employed physician at the jail that he was paralyzed, the doctor laughed at Mr. Smith and told him he was faking. For a week before he was able to bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit arising from the incident in 2018.

191.    On August 28, 2016, Andrew Bowen arrived at the Greene County Jail having been severely beaten by the arresting Greene County Sheriff's Deputy. He was bleeding from the head, unconscious, and exhibiting agonal breathing/loud snoring – a clear indicator of severe head and brain injury. While jail staff laughed at Mr. Bowen, a Turn Key nurse attempted to awaken Mr. Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment, or arrange for Mr. Bowen's transfer. Rather, no ambulance was called until after jail employees cleaned the blood off him, changed him out of his blood-soaked clothes, and booked him into the jail. When he finally arrived at the hospital Mr. Bowen had a large hematoma on his forehead and a gaping laceration on his chin. He was unconscious, experiencing seizures, and had to be intubated due to respiratory failure. After a month in the hospital Mr. Bowen was released to a step-down facility, but never fully recovered from the severe brain injury and the delay in treatment he suffered. Turn Key settled a federal civil rights lawsuit arising from the incident in April 2019.

192.    Russell Ted Foutch died September 30, 2016, after staff at the Creek County Jail observed him foaming at the mouth and coughing up blood. Before his death, Mr. Foutch

complained of shortness of breath, lost consciousness multiple times in front of jail staff, and reported coughing up blood. Other inmates and Mr. Foutch's family noticed that he was ill and asked that he receive treatment. Mr. Foutch laid in his cell and slowly died from complications related to pneumonia without ever receiving the medically appropriate treatment and care he so desperately and obviously needed to save his life.

193.    When James Buchanan was booked into the Muskogee County Jail in November 2016, he informed staff that he had been in a car accident and was suffering from broken ribs, a collapsed lung, and neck problems. He was nonetheless placed in a general population pod where, over the course of the next ten days, Mr. Buchanan became quadriplegic one limb at a time because a cervical epidural abscess was allowed to fester. Turn Key medical staff were aware that Mr. Buchanan was experiencing sudden and expanding paralysis but did nothing, even after he lost the ability to feed and hydrate himself. Rather they looked on as other inmates helped Mr. Buchanan eat, drink, and use the toilet, and scheduled him for a visit with the doctor the following week. It was only when Mr. Buchanan was found lying in a puddle of his own urine, complaining of 10/10 pain nearly 11 days after the initial onset of his symptoms that he was finally sent to the hospital. Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

194.    On December 14, 2016, 41-year-old Sharon Lavette Alexander of Little Rock, Arkansas, died at Pulaski County Jail. She had been booked into custody the day before her death. When she was processed into the jail, her asthma inhaler was taken from her and not returned. An autopsy revealed acute exacerbation of asthma was the cause of her death. A federal wrongful death lawsuit was filed by Alexander's family in January 2018. In May 2019 the case settled for $425,000 – Pulaski County paid $50,000 and Turn Key paid $375,000 to the family.

195.     On February 15, 2017, Trillus Smith died in the Pulaski County Regional Detention Facility from acute pneumonia and dehydration. In the two weeks preceding her death, Turn Key medical staff observed that Ms. Smith was becoming less oriented to reality, unable to communicate, lethargic, not eating or drinking, and that her eyes were rolling in her head. Several nurses collected dangerously abnormal vital signs including critically low blood pressures on February 13th and 14th. Ms. Smith's blood labs also indicated a life-threatening condition. Despite these critically abnormal vital signs and values, Ms. Smith was never assessed by a higher-level caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

196.     On June 10, 2017, Ronald Garland was brought to the Creek County Detention Center, a Turn Key facility, on charges of driving under the influence. No intake medical screening was performed and Mr. Garland was placed in a housing unit. More than 12 hours later a nurse noted that a jail staff member alerted her Mr. Garland was "acting weird" in the housing unit. She assessed Mr. Garland shortly thereafter and noted he denied being under the influence of any drugs or alcohol, that he was unable to answer orientation questions, he was moaning and yelling, could not focus or sit still. She charted his vital signs as a range and noted that Mr. Garland needed a medical assessment ASAP as he was potentially detoxing. Two hours later, the same nurse noted that Mr. Garland was confused, experiencing active visual hallucinations, but non combative. Despite his obviously worsening condition, this nurse did not take any steps to provide Mr. Garland with care or determine the cause of his symptoms. Later that night, deputies moved Mr. Garland to a restraint chair and shoved his head downward between his knees, putting extreme pressure on his chest and diaphragm, causing Mr. Garland to go limp. At the hospital, Mr. Garland was

diagnosed with an anoxic brain injury from which he did not recover and subsequently passed away.

In its Order denying Turn Key's Motion to Dismiss the Court emphasized:

[nurse] Janes allegedly was aware that Garland was moaning, yelling, and banging on the cell door, suggesting that he was in some discomfort. The pleading also alleges facts from which the court may infer that Janes subjectively knew that Garland's condition was deteriorating—specifically, that, at nine o'clock, Garland experienced symptoms of visual hallucinations and confusion that were not documented at the six o'clock hour. Finally, the Second Amended Complaint alleges that '[a]t no point did Janes . . . take any steps to provide [Garland] with any care despite the severe risk from unscreened detoxification, and despite actual knowledge that [Garland's] condition was worsening.' Taking these allegations as true and viewing them in the light most favorable to plaintiff, the Second Amended Complaint includes plausible allegations from which the court may infer that Janes knew of the risk that Garland's condition was worsening, resulting in increasingly severe symptoms, and chose to disregard it. Thus, the Second Amended Complaint states a plausible claim that Janes acted with deliberate indifference to Gardner's serious medical needs by recklessly failing to treat Garland properly.

*Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at *16-17 (N.D. Okla. Jan. 17, 2020). A lawsuit regarding Mr. Garland's death settled in 2021 when Creek County paid Mr. Garland's Estate $750,000 and Turn Key paid an additional confidential amount.

197.   On August 20, 2017, Rebecca Royston was booked into the Bryan County Detention Center without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. Despite suspecting that Ms. Royston was intoxicated and knowing that there were no medical personnel on site, deputies placed Ms. Royston in an isolation cell, hog-tied her, and left. Shortly thereafter, deputies observed Ms. Royston banging her head against concrete. Rather than arranging for a medical assessment, deputies entered Ms. Royston's cell and put her in a football helmet so she wouldn't strike her head again while still in the hog-tie. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally

Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging, and the delay in care caused permanent and irreversible damage. Turn Key settled a lawsuit arising from the incident in 2021.

198.    Twenty-five-year-old Caleb Lee died on September 24, 2017, as a result of a cardiopulmonary arrest after Turn Key medical staff at the Tulsa County Jail ignored his serious and worsening symptoms for days. When he was booked into the jail, staff noted that Mr. Lee was being treated at a methadone clinic daily and that, by then, it had been about 48 hours since his last dose. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. By his second day in the jail Mr. Lee was hallucinating, and over the course of the next several days his vital signs became abnormal. The onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition. Mr. Lee continued to deteriorate – he was not eating and was visibly shaking and delusional. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was found lying on the floor complaining of chest pain. He began convulsing and foaming at the mouth when he arrived at the medical unit, but medical personnel did not offer any treatment while Mr. Lee was convulsing. Mr. Lee was eventually transported to the hospital, where he died. A lawsuit alleging

Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

199.    On October 17, 2017, Brenda Jean Sanders was booked into the Creek County Justice Center for outstanding warrants. While in the jail and under the care and control of the Turn Key medical personnel, Ms. Sanders' health dangerously deteriorated. Medical personnel and jail staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history. On or about November 20, 2016, a full 35 days after entering the Creek County Justice Center, Turn Key medical personnel and jail staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Ms. Sanders' serious medical needs is ongoing.

200.    On October 30, 2018, Angela Yost died after six days of suffering without medical attention at the Ottawa County Jail. Medical staff at the jail were well-acquainted with Ms. Yost and were aware she had several serious medical conditions, including that she had recently been hospitalized for a poorly-healing wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not provided any medications for the first three days she was at the jail, even as her condition observably declined. During the first three days, Ms. Yost's pain in her left leg increased and the wound began to secrete a yellow discharge and foul odor. She struggled to move, laid on

the floor, and complained that she needed to be seen by a doctor and receive her medications. When Ms. Yost was finally assessed, the Turn Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for her to be seen by a doctor or NP, despite the fact that she had numerous and serious co-morbidities, had not received any medications for three days, and obviously had an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's condition, and despite the NP's awareness that Ms. Yost had an active infection and serious co-morbidities, she also did nothing. Ms. Yost continued to observably deteriorate over the next three days. On the morning of October 30, she was helped to the shower where she collapsed and was unresponsive. She was pronounced dead 17 minutes after she arrived at the emergency room. A lawsuit arising from her death was filed in 2020.

201. In November 2018, Misty Bailey, a pretrial detainee at Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not keep down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to the hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to the hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care.

At the hospital Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, the court emphasized that *Monell* liability is adequately alleged at the pleading stage where plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical

facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." *Bailey v. Turn Key Health Clinics, LLC*, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case appears to have settled confidentially as a stipulation of dismissal was filed on December 10, 2021.

202.    Lesley Sara Hendrix died on October 12, 2020, after repeated requests for medical attention were disregarded and denied. Ms. Hendrix developed a rash on her legs in early October, which she reported to Turn Key medical personnel, but nothing was done to address this condition. Approximately one week before her death, she asked the nurse dispensing medications to arrange for a medical evaluation because she was not feeling well, experiencing nausea, severe pain, dizziness, and vomiting. Turn Key staff told Ms. Hendrix that they would not permit her to make an appointment orally and that she would have to use a computer kiosk. The only kiosk Ms. Hendrix had access to was broken, and no other means of scheduling an appointment were provided. By October 10, Ms. Hendrix was pale with black circles and bags under her eyes, incoherent, acting erratically, struggling to stand, and complaining that she felt like she was dying. Having seen on a video visit the dire condition her daughter was in, Ms. Hendrix's mother called the jail and told staff she required immediate medical attention, but Ms. Hendrix received none. The next day Ms. Hendrix collapsed and was finally transported to the hospital. Upon her arrival

Ms. Hendrix was in critical condition, was in acute respiratory distress, metabolic acidosis and severe septic shock. During the emergency medical assessment hospital staff found Ms. Hendrix had an enormous black, bulging wound to her perineum, lower abdomen, buttocks, and genitals caused by necrotizing fasciitis. Ms. Hendrix died the following morning in the ICU at the hospital. A federal lawsuit related to her death is ongoing.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Unconstitutional Medical Care
(Plaintiff Estate against each Individual Defendant)

203.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

204.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

205.    Amy Cross was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

206.    Ms. Cross was a pre-trial detainee.

207.    As a pre-trial detainee, she was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment. To the extent her status was considered a convicted inmate, Ms. Cross was protected from deliberate indifference to her known serious medical needs by the Eighth Amendment.

208.    Individual Defendants, as private actors working in a jail, are not entitled to qualified immunity.

209.    Each Individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

210.    As a result of the allegations contained in this Complaint, Individual Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Cross' constitutional rights by acting with deliberate indifference to her serious medical needs and disregarding the excessive risks associated with her life-threatening medical condition, despite being expressly aware of her known serious medical needs and obvious need for the same.

211.    All of the Individual Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

212.    The acts or omissions of these Defendants were the legal and proximate cause of Ms. Cross' death and her Estate's losses and injuries.

213.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

214.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

215.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Unconstitutional Policies, Customs, and Training**
(Plaintiff Estate against Entity Defendants)

216.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

217.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

218.    Amy Cross was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

219.    Ms. Cross was a pre-trial detainee.

220.    As a pre-trial detainee, she was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment. To the extent her status was considered a convicted inmate, Ms. Cross was protected from deliberate indifference to her known serious medical needs by the Eighth Amendment.

221.    Defendant Turn Key is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which include customs and training.

222.    The Weld County Defendants are not sued for their own conduct, but rather because they are non non-delegably liable for Turn Key's unconstitutional policies.

223.    Turn Key had a widespread pattern, practice, and custom of failing to properly treat inmates with serious medical needs, often disregarding them as faked, purposeful or malingering.

224.     Alarming deficiencies in screening, monitoring, and the adequate delivery of medical care were identified and otherwise known and obvious to Turn Key for years prior to Ms. Cross's death. Despite this knowledge, Turn Key and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk, in part because of impermissible profit driven considerations affecting hospitalizations, diagnostic testing, and staffing.

225.     Turn Key failed to adequately train personnel to recognize and respond to the serious medical needs of their patients. In the light of the duties assigned to health care workers, the need for more or different training and supervision of them was obvious, and the failure to do so by Turn Key was deliberately indifferent to the rights of the relevant public.

226.     Defendant Turn Key ratified the unconstitutional conduct of its employees, agents, and/or subcontractors with regard to the unconstitutional conduct visited upon Ms. Cross, as they approved of the conduct and the basis for it.

227.     Entity Defendants' unconstitutional acts and omissions were moving forces in the unconstitutional acts of the individual defendants and were the legal and proximate cause of Ms. Cross' injuries and her Estate's losses.

228.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

229.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

230.    Plaintiff is also entitled to punitive damages against Turn Key, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### THIRD CLAIM FOR RELIEF
**Wrongful Death**
(Plaintiffs V.C., R.C., and K.C. against Turn Key Defendants)

231.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

232.    Plaintiffs V.C., R.C., and K.C. are the children and heirs of Amy Cross.

233.    Turn Key is a private corporation that contracts with Weld County to provide medical care and health services to inmates at the jail.

234.    Turn Key is vicariously liable for the negligent acts and omissions of their agents and/or employees, including but not limited to, Individual Defendants.

235.    Individual Defendants are private individuals, not governmental actors, and are therefore not entitled to any immunity under the Colorado Governmental Immunity Act.

236.    Individual Defendants, and any other medical care workers interacting with Ms. Cross during the relevant time period, had a duty to provide care to inmates, including Ms. Cross.

237.    Individual Defendants had a nurse-patient or nurse-practitioner-patient relationship with Ms. Cross and were acting within the scope of their employment.

238.    With respect to their care and treatment of Ms. Cross, Individual Defendants owed her a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Through their actions and omissions,

Individual Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Ms. Cross, causing her death.

239.     These duties of care are also informed by state law. Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

240.     Turn Key also had a duty to implement reasonable policies and exercise reasonable care in the training of health care workers at the Weld County Jail and ensuring adequate staffing and resources. Turn Key breached its duty to exercise reasonable care in a manner that provided inmates with reasonable medical care and treatment.

241.     As a direct and proximate result of Turn Key's own negligence in staffing, training and supervision, as well as vicariously for its employees, Plaintiffs have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, upset, grief, loss of their mother, impairment in the quality of their lives, anger, depression, and all other purely economic and non-economic damages under the Colorado Wrongful Death Act.

## VI.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court award against Defendants:

(a)     All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages available under the law;

(b)     Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all Individual Defendants and Turn Key Defendants;

(c)     Attorneys' fees and costs;

(d)     Pre- and post-judgment interest as appropriate; and

(e)     Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST TRIAL BY JURY.**

Respectfully submitted this 6th day of December, 2022,

*/s/ Anna Holland Edwards*
Anna Holland Edwards
Erica T. Grossman
John Holland
Dan Weiss
Rachel Kennedy
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
anna@hheglaw.com
Phone:  (303) 860-1331
Fax:  (303) 832-6506
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF REVIEW</u>

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

*/s/ Anna Holland Edwards*
Anna Holland Edwards