IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-03143-NRN

THE ESTATE OF AMY LYNN CROSS,
by and through its Personal Representative Jennifer Bauder,
V.C., through his guardian, Jennifer Bauder
R.C., through his guardian, Jennifer Bauder
K.C., through her guardian, Lisa McMullen,

Plaintiffs,

v.

TURN KEY HEALTH CLINICS, LLC, *et al.*,

Defendants.

---

## BRIEF IN SUPPORT OF DEFENDANT TURN KEY HEALTH CLINICS, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

---

Defendant Turn Key Health Clinics, LLC ("Turn Key"), by and through its counsel of record at SWEET, DEWBERRY, & HUBBARD, PLC, respectfully submits the following Brief in support of its Motion to Dismiss (ECF Doc. 13) pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted as a matter of law.

## STATEMENT OF THE CASE

Plaintiffs, Jennifer Bauder, as personal representative of the Estate of Amy Lynn Cross and guardian of V.C. and R.C., and Lisa McCullen, as guardian of K.C., bring this action pursuant to 42 U.S.C. § 1983 against Defendants Turn Key Health Clinics, LLC ("Turn Key"), Turn Key Health Clinicians, PLLC, Turn Key Health Clinics Colorado, LLC, Turn Key Health Medical Colorado, PLLC, Erica Alcaraz, Beatriz Ortiz, Kristin Miller,

Teresa Sipola, Board of County Commissioners of Weld County, and Sheriff Steve Reams. ECF Doc. 1, *Compl*. Plaintiffs' claims arise from the care and treatment their decedent, Amy Cross ("Ms. Cross"), received during her incarceration at the Weld County Jail ("WCJ") from September 3, 2021, until the time of her death from methamphetamine overdose on September 5, 2021. *Id*., ¶ 34. Plaintiffs' allegations are as follows:

Ms. Cross was booked into the WCJ on September 3, 2021, for drug-related charges. *Id*., ¶ 34. Unknown to anyone except for Ms. Cross, Ms. Cross "smuggled a bag of methamphetamine inside of her body" (*i.e.*, Ms. Cross intentionally inserted the baggy into her vagina to conceal it from law enforcement officers during her arrest) prior to her booking into the WCJ. *Id*., ¶ 42. Ms. Cross did not disclose to anyone at the WCJ that she had inserted the bag of methamphetamine into her vagina. *Id*., ¶ 43. During her medical intake screening, Ms. Cross willfully withheld the information, known only to her, that she had placed a baggy of methamphetamine into her vagina, depriving any staff at the WCJ of the specific knowledge that she was at risk of overdose. *Id*. Instead, Ms. Cross reported to the intake medical screening nurse, Defendant Nurse Ortiz, only that she "regularly used illegal drugs," which included opiates, benzodiazepines, and IV drugs, and that she had used "methamphetamine and Xanax off and on for the past two weeks." *Id*., ¶¶ 43-44. She also specifically reported having a history of abusing Fentanyl ("too many daily") and "that she had done illegal drugs the day of booking." *Id*., ¶ 44. She also reported a medical history of withdrawal symptoms (including sweats, nausea), a history of seizures, and "a host of other mental health problems." *Id*., ¶ 45.

Plaintiffs conclusory allege that "health care workers in the jail understood that Ms. Cross had a history of drug abuse and was likely to have overdose or withdrawal related medical issues." *Id.*, ¶ 41. However, Plaintiffs concede that the only person with knowledge that Ms. Cross had smuggled a bag of methamphetamine into her vagina prior to booking at the WCJ was Ms. Cross, and Ms. Cross deliberately withheld this information from jail and medical staff at the WCJ. *Id.*, ¶¶ 42-43.

Nurse Ortiz noted that Ms. Cross appeared to be under the influence of Fentanyl, a drug she reported having taken earlier that day, and that she was "irritable." *Id.*, ¶ 47. Therefore, Nurse Ortiz placed Ms. Cross on withdrawal protocols and entered orders for withdrawal medications, but she placed the medications on hold because Ms. Cross would not consent to a urine sample as requested. *Id*. Apparently, Ms. Cross never removed the bag of methamphetamine from her vagina once she was placed into a cell.

Plaintiffs allege that Turn Key protocol requires inmates "admitting *to experiencing* withdrawal symptoms upon stopping drugs" to have an "immediate evaluation by a provider." *Id.*, ¶ 46 (emphasis added). Plaintiffs allege that Nurse Ortiz failed to make an "immediate evaluation by a provider" on September 3, 2021, based on Ms. Cross's report of a *remote medical history of withdrawal symptoms* on September 3, 2021. *Id.*, ¶ 45.

Taking Plaintiffs' allegations on their face, Turn Key's protocol does not require any "immediate evaluation" or "immediate provider referral" due to report of a *history* of withdrawal symptoms and instead, as it is alleged by Plaintiffs, would on its face require such referral and/or evaluation upon report of *experiencing withdrawal symptoms upon stopping*. *Id*. Thus, Plaintiffs' criticism against Nurse Ortiz during the intake booking

screening appears to be misguided based upon Plaintiffs' clear confusion as to what the protocol actually states (as it is alleged by Plaintiffs).

As part of her withdrawal protocols, Ms. Cross was placed on periodic COWS (Clinical Opiate Withdrawal Scale) evaluations for drug withdrawals, which entails evaluation of her clinical presentation, frequent checks, and vital signs. *Id*., ¶ 48. Unidentified medical personnel performed the first COWS check, at which time Ms. Cross "appeared agitated, fidgety, had chills and an elevated pulse." *Id*., ¶ 49.

Plaintiffs allege that, sometime between 4:00 p.m. and 4:45 p.m. the next day, on September 4, 2021, Ms. Cross had a worsening in her condition and complained of chest pain. *Id*., ¶ 50. Deputy Secosky transported Ms. Cross via wheelchair to the medical unit at around 4:45 p.m. *Id*., ¶ 51. During this transport, Ms. Cross "was erratic and animated," including "skipping along the hall and squatting down, flapping her knees together and grabbing her head." *Id*., ¶ 52. Deputy Wilson, who was personally familiar with Ms. Cross, observed Ms. Cross sitting on the floor and stating that she felt like she was going to have a seizure. *Id*., ¶ 53. Deputy Wilson and Deputy Secosky transported Ms. Cross to the medical unit. *Id*. Ms. Cross began breathing fast, having tremors, and said she was going to vomit, so the Deputies laid her on her side on the floor of the hall and instructed her on breathing. *Id*., ¶ 54.

At 4:49 p.m., the Deputies called a Medical Code 5, which is a medical emergency, for Ms. Cross over the radio. *Id*., ¶¶ 55-56. This code was responded to by numerous medical and detention staff, including at least five medical staff members from Turn Key. *Id*., ¶¶ 57-58. Ms. Cross repeatedly yelled: "I'm burning up and need to go to the hospital

and I have chest pain." *Id.*, ¶ 59. Notably, Ms. Cross continued to withhold critical information, known only to Ms. Cross, which would have put all staff on clear notice of her emergent medical condition—specifically, that she was harboring a bag of methamphetamine in her vagina.

Medical staff, Nurse Miller, took Ms. Cross's vital signs and noted a high pulse of 152, "high blood pressure, elevated respirations of 20, and a low pulse oxygen level."[1] *Id.*, ¶ 60. Ms. Cross was also "animated, jerky, and her legs were shaking." *Id.*, ¶ 61. Nurse Miller charted that Ms. Cross was diaphoretic ("sweaty or clammy") and shaking during her transport by wheelchair to the medical office, where she arrived at 4:58 p.m. *Id.*, ¶¶ 62-63. Ms. Cross then reported to Nurse Miller that she could not urinate. *Id.*, ¶ 64.

Nurse Miller attempted to obtain an EKG but could not complete it because "Ms. Cross 'would not' hold still." *Id.*, ¶ 65. Nurse Miller called the provider, Nurse Practitioner Teresa Sipola, who instructed her to catheterize Ms. Cross to get a urine sample "to ensure she was unable to urinate as patient had claimed she 'could not pee' multiple times." She also ordered IV fluids be started on Ms. Cross. *Id.*, ¶ 66. Additionally, Nurse Practitioner Sipola ordered a dose of withdrawal medications be provided to Ms. Cross even without a urine sample. *Id.*, ¶ 67.

Throughout this patient encounter, Ms. Cross complained of chest pain, the inability to urinate, feeling like she was burning up, yelled that she needed to go to the hospital, and was highly fidgety and obviously agitated. *Id.*, ¶ 70. Nurse Miller observed

---

[1] Plaintiffs allege some, but not all, of the actual vital signs and instead refer to certain vital signs with qualifiers of "high" or "low."

that Ms. Cross was agitated, "fidgety," unable to hold still, and Ms. Cross refused to allow Nurse Miller to catheterize her (undoubtedly because she continued to hold the bag of methamphetamine in her vagina). *Id*., ¶ 67. The IV was placed, but Ms. Cross removed it herself. *Id*., ¶ 68. Nurse Miller administered the ordered withdrawal medications to Ms. Cross, but Ms. Cross spit them out all over the table. *Id*. Plaintiffs allege that all of these clinical findings were indicative of a serious medical condition. *Id*., ¶ 71.

Nurse Miller assessed Ms. Cross as being at "risk for fluid volume deficit, Risk for falls, Inability to cope." *Id*., ¶ 69. Plaintiffs allege that Nurse Miller and Nurse Practitioner Sipola believed that Ms. Cross was refusing to cooperate with them, and that Nurse "Miller became angry at Ms. Cross and went on a 'tirade' in the medical unit." *Id*., ¶ 72. Plaintiffs allege that Nurse Practitioner Sipola and Nurse Miller should have known at this time that Ms. Cross was suffering from methamphetamine toxicity, overdose, and cardiac distress, and that they were aware that Ms. Cross required immediate hospitalization, and that it was "reckless to dismiss those emergency symptoms without obtaining an EKG or higher-level assessment." *Id*., ¶¶ 73-77. By this point in time, Ms. Cross still withheld critical information, known only to her, that she had a bag of methamphetamine in her vagina.

Ms. Cross told Nurse Miller that "she needed to be 'on a level,' meaning a suicide watch level, adding 'but not a level one in case something happens to me and I can't do anything about it.'" *Id*., ¶ 79. Therefore, Nurse Miller followed Ms. Cross's request and placed her on suicide watch in Nora pod. *Id*., ¶ 80. At around 6:00 p.m., Deputies Wilson and Secorsky transported Ms. Cross to Nora Pod. *Id*., ¶ 81. During this transport, Ms. Cross continued behaving erratically, including jumping out of her wheelchair and

telling the deputies that she was going to have a seizure. *Id*., ¶¶ 82-83.

After the Deputies placed Ms. Cross in her cell in Nora Pod, Ms. Cross took off her shirt, said she was hot, and moved between sitting and lying on the floor. *Id*., ¶ 84. During Nurse Shift Change at around the same time Ms. Cross was transported to the cell, another nurse, Defendant Erica Alcaraz, LPN, received nurse report from Nurse Miller, including that "a medical code had been called for Ms. Cross for some 'unknown issue' where she toppled out of a wheelchair earlier in the day, and that Ms. Cross had refused to take medications or talk to nursing." *Id*., ¶ 86. Nurse Miller also reported to Nurse Alcaraz that "She is acting a fool, and Terry [Sipola] said we are not sending her out." *Id*., ¶ 87. Plaintiffs claim this amounts to "active[] conspiracy to prevent Ms. Cross from receiving medical attention for her known medical emergency regardless of how sick she became" *Id*., ¶  89.

Also during detention shift change, Deputy Aslin informed oncoming Deputy Betz that Ms. Cross was on five-minute suicide watch checks, "that Ms. Cross was having 'seizure like activity,' but that medical staff had concluded that the seizures were not 'real.'" *Id*., ¶¶ 91-92. He also told Deputy Betz that "the medical team had instructed deputies not to call any more Medical Code Fives for Ms. Cross, but instead just to call them directly." *Id*., ¶ 93. When Deputy Betz observed Ms. Cross, he saw she was "super out of it," behaving strangely, having seizure like activity, "flailing in her cell," and not responding to Deputy Betz. *Id*., ¶ 94. Deputy Betz called Nurse Alcaraz to ask whether they were not to call medical emergencies, and Nurse Alcaraz stated that "deputies should not call an emergency 'unless she hit her head or was not breathing.'" *Id*., ¶ 95.

Minutes later at around 6:30 p.m., Deputy Betz observed that Ms. Cross was "spitting up 'brown mucusy stuff' and 'shaking on the floor," so he called and reported these symptoms to Nurse Alcaraz. *Id.*, ¶¶ 96-97. Nurse Alcaraz told Deputy Betz that she would check on Ms. Cross during her scheduled medication administration pass ("med pass"), which occurred approximately 30 minutes later at 7:08 p.m. *Id.*, ¶¶ 97-98.

When Nurse Alcaraz arrived on unit, Ms. Cross was lying on the floor with her eyes closed, was still topless, and was shaking. Nurse Ortiz joined Nurse Alcaraz in Ms. Cross's cell shortly thereafter. *Id.*, ¶ 99. Nurse Alcaraz began assessing Ms. Cross, including opening her eyes and confirming that she was visually responsive but unable to verbalize. *Id.*, ¶ 100. Nurse Alcaraz noted her breathing was fast, and Plaintiffs allege Nurse Alcaraz then "falsely charted" that she "began normal breathing patterns." *Id.*, ¶ 101. When the nurses asked Ms. Cross questions, she grunted in response. *Id.*, ¶ 102. Nurse Alcaraz also noted that Ms. Cross was "gathering spit in her mouth and making bubbles" and "refusing to speak to medical and closing her eyes tightly." *Id.*, ¶ 103. Nurses Alcaraz and Ortiz believed Ms. Cross was refusing to speak to them and purposely closing her eyes tightly in noncompliance, and they told Ms. Cross that she could not have any more withdrawal medication unless she provided a urine sample. *Id.*, ¶ 104. Despite this commentary, Ms. Cross did apparently receive medications at this time. *See Id.*, ¶ 120.

The nurses assessed Ms. Cross as being "fine" and "stable," and they told Deputy Betz that Ms. Cross's vital signs were stable—which Plaintiffs believe is "extremely unlikely" to be true. *Id.*, ¶ 106. The nurses instructed Deputy Betz to make sure Ms. Cross "kept breathing" and to make sure she did not aspirate on the fluid she was spitting up.

*Id.*, ¶ 107. Plaintiffs allege that Ms. Cross was suffering from a medical emergency at this time, which Nurses Alcaraz and Ortiz failed to recognize and treat. *Id.*, ¶¶ 109-111.

At 8:00 p.m., Deputy Betz asked Deputy Beaman to perform her rounds on Ms. Cross, and Deputy Beaman observed that Ms. Cross was lying on the floor, shirtless, with "brown gunk all over her face and was foaming at the mouth." He believed she was choking. Therefore, he called a Medical Code Five. *Id.*, ¶¶ 112-114. He also went into her cell and rolled Ms. Cross over, asking her to try to spit out what was in her mouth, which Ms. Cross attempted to do. *Id.*, ¶ 116. Ms. Cross was not "verbal but was grunting or mumbling like she understood and was trying to respond." *Id.*

Numerous detention and medical personnel responded to the Medical Code, including Nurses Alcaraz and Ortiz. *Id.*, ¶ 117. Ms. Cross attempted to clean her own face, but Deputy Beaman took over because Ms. Cross was not strong enough. *Id.*, ¶ 118. Medical staff took Ms. Cross's vital signs and again asked her to provide a urine sample. *Id.*, ¶ 119. Nurses Alcaraz and Ortiz believed the brown gunk around Ms. Cross's face to be the medications she had been given earlier. *Id.*, ¶ 120. Nurse Ortiz in hindsight said Ms. Cross appeared "horrendous" and was throwing up during this encounter, but that she had normal vital signs, and Nurse Alcaraz thought she was shaking and "blowing bubbles or intentionally spitting" and "refused to open her eyes," and Nurse Alcaraz did not believe Ms. Cross looked worse than her previous assessment. *Id.*, ¶¶ 122-124.

At or before 8:39 p.m., Nurse Ortiz notified Nurse Practitioner Sipola of Ms. Cross's presentation and their findings, and Nurse Practitioner Sipola prescribed anti-nausea medication. *Id.*, ¶ 126. Deputy Betz continued to check on Ms. Cross and observed that

later her "fingers were turning blue." *Id.*, ¶ 131. Deputy Betz informed Nurse Alcaraz that Ms. Cross's fingers were turning blue, and Nurse Alcaraz told Deputy Betz that this was due to Ms. Cross lying on the cold floor. *Id.*, ¶ 132. "A little later," Nurse Alcaraz followed up with Deputy Betz to ask about Ms. Cross's breathing and suggested that her fingers could be turning blue due to breathing funny, which could decrease her oxygenation. However, Nurse Alcaraz did not come assess Ms. Cross and instructed Deputy Betz instead to "keep monitoring her and notify them if it got worse." *Id.*, ¶¶ 133-134.

Between 9:00 p.m. and 10:30 p.m., Deputy Betz repeatedly triggered her security chain of command regarding concerns as to the medical response to Ms. Cross's condition, and multiple higher-level detention officials told Deputy Betz that she should "document her observations," and she could either trust medical staff, call medical to the Pod again, call another Code 5, or call for a different nurse. *Id.*, ¶¶ 138-142. At some point after 10:30 p.m., Deputy Betz called the medical unit again and asked for Nurse Ortiz to come assess Ms. Cross; however, Nurse Ortiz was treating another patient and, therefore, Nurse Alcaraz responded to the call for medical attention at 11:15 p.m.. *Id.*, ¶¶ 143-146. At this time, Ms. Cross's blood pressure was 70/52, and she was breathing with shallow breaths. *Id.*, ¶ 147. Nurse Alcaraz called Nurse Ortiz for assistance, who arrived six minutes later at 11:24 p.m. *Id.*, ¶¶ 149-150. By the time Nurse Ortiz arrived, Ms. Cross was pulseless. *Id.*, ¶ 151. Four minutes later, nurses called a code and started CPR, and six minutes after Nurse Ortiz's arrival an ambulance was called. *Id.*, ¶¶ 152-153. Paramedics arrived at 11:40 p.m. and took over CPR, but Ms. Cross was pronounced dead at 12:01 a.m. *Id.*, ¶¶ 156-157. Ms. Cross overdosed on the methamphetamine that

was in the bag in her vagina. *Id.*, ¶¶ 3, 160-161. Nobody, except for Ms. Cross, was aware of the bag of methamphetamine hidden in her vagina, until the Medical Examiner performed her autopsy. *Id.*, ¶ 161.

Plaintiffs bring a cause of action for deliberate indifference under a municipal theory of liability against Defendant Turn Key. *Id.*, ¶¶ 167-202, 216-230. Plaintiffs allege that Turn Key contracted with the Weld County Sheriff's Office to provide health care to inmates incarcerated at the WCJ. *Id.*, ¶ 16. In such capacity, Plaintiffs allege that Turn Key assumes the delegated state function of providing medical care and treatment to inmates. *Id.*, ¶ 26. Plaintiffs allege, without any specific factual averments in support, that "Turn Key maintained constitutionally deficient policies at Weld County Jail and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of inmates' serious medical needs." *Id.*, ¶ 168.

Finally, Plaintiffs also bring a cause of action under Oklahoma common law for medical negligence against all Turn Key Defendants. *Id.*, ¶¶ 231-241.

<u>**ARGUMENTS AND AUTHORITIES**</u>

**PROPOSITION: Plaintiff has failed to allege facts sufficient to state a constitutional claim against Defendant Turn Key under on a Municipal Liability theory.**

A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007). In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. The factual allegations within the Complaint "must be enough to raise a right to

relief above the speculative level." *Id*. (citations omitted).

A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell* at 570. For a complaint to have facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009). "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support of these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). A plaintiff's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

The law is well settled that there is no vicarious liability for § 1983 claims against Defendants such as Turn Key. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978), and the language of § 1983 cannot be read to impose vicarious liability based solely on the existence of an employer-employee relationship. *Id*. at 692. The law is also well established that the only method by which Turn Key, a private healthcare company under contract with the County, could arguably be found to have been deliberately indifferent would be through a municipal liability theory under *Monell*.

While *Monell* explicitly applies to municipal governments, the Tenth Circuit has extended the *Monell* doctrine to private entities acting under color of state law. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted). An entity like

Turn Key "cannot be held liable solely because it employs a tortfeasor—or, in other words ... cannot be held liable under § 1983 on a respondeat superior theory." *Id*. (quoting *Monell*, 436 U.S. at 691.). "[T]o hold the entity liable, the plaintiff must identify an official policy or a custom that is the 'direct cause' or 'moving force' behind the constitutional violations." *Aguilar v. Colorado State Penitentiary*, 656 Fed.Appx. 400, 403 (10th Cir. 2016) (unpublished) (quoting Dubbs, 336 F.3d at 1215).

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). The plaintiff must further show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted). A municipal policy or custom can take the form of "(1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such

final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Thus, to state a § 1983 claim against Turn Key, Plaintiffs must allege facts sufficient to show that Turn Key executed a policy or custom that <u>caused</u> the alleged constitutional deprivations. The Tenth Circuit has made clear that "a municipality can be liable under § 1983 only where its policies are the '<u>moving force [behind] the constitutional violation.</u>'" *City of Canton Ohio v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 388-89 (1989) (emphasis added).

Here, Plaintiffs have failed to plead such sufficient allegations of any *specific* defective policy, practice, or custom of Turn Key which was the moving force behind Ms. Cross's alleged constitutional deprivation. Plaintiffs are unable to satisfy the requirements of the municipal liability theory, and they are unable to establish that Turn Key was deliberately indifferent.

In support of their *Monell* claim against Defendant Turn Key, Plaintiffs first allege that Defendant Turn Key is a "for-profit medical provider" and therefore "maintains a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, failing to order diagnostic testing, failing to timely send patients to the hospital in order to save money and increase profits, understaffing, and using nurses to practice medicine recklessly outside their scope." *Id.*, ¶ 175. Plaintiffs further allege that because Turn Key

is only financially liable for medical and pharmaceutical costs pursuant to their contract with Weld County up to a certain limit (at which point the financial liability shifts to the County), this creates "a strong financial incentive to not send seriously ill patients to an outside health care provider." *Id.*, ¶¶ 176-180.

Secondly, Plaintiffs allege in a conclusory manner that "there was a well-known widespread pattern and practice of deliberately indifferent medical care at Turn Key facilities." *Id.*, ¶ 181. In support of this claim, Plaintiffs outline a series of other lawsuits unrelated to the claims at issue in this case, in different county jails, involving different medical conditions, different healthcare staff, and different healthcare policies and procedures in support of her claim against Turn Key. *Id.*, ¶¶ 182-202. Notably, not a single case referenced by Plaintiffs has had a judgment entered against Turn Key nor a finding of fact made against Turn Key; in fact, most such cases were voluntarily dismissed, dismissed by the court, or judgment was entered *in favor of Turn Key*. *See, e.g., Buchanan v. Turn Key Health Clinics, LLC,* No. 18-CV-00171-JFH, 2022 WL 2070493, at *11 (E.D. Okla. June 8, 2022).

Thirdly, Plaintiffs further claim that Turn Key failed to provide training to its employees "to recognize and respond to the serious medical needs of their patients," that Turn Key "ratified the unconstitutional conduct of its employees," and that Turn Key was deliberately indifferent to the need for supervision of its staff, citing to only generalized and collective allegations as to their training and supervision claims. *Id.*, ¶¶ 225-226.

Plaintiffs' allegations as to the "Entity Defendants" are collective and generically pled. The Tenth Circuit has repeatedly affirmed that generic accusations against the

"Defendants" fails to meet the "fair notice" standard under Fed. R. Civ. P. 8. *See Robbins v. Oklahom*a, 519 F.3d 1242, 1250 (10th Cir. 2008). The Tenth Circuit has also stressed the importance of factual allegations in a § 1983 claim when qualified immunity is likely to be asserted as an affirmative defense. *Robbins,* 519 F.3d at 1249*; Gray v. University of Colo. Hosp. Auth*., 672 F.3d 909, 919 n. 9 (10th Cir. 2012) (noting use of collective term "Defendants" failed to inform individuals what unconstitutional acts they allegedly committed); *Bryson v. Gonzales*, 534 F.3d 1282, 1290 (10th Cir.2008) ("allegations that simply name the 'Defendants' generically" do not state facts about an individual defendant's conduct); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976); *Garrett v. Stratman*, 254 F.3d 946, 950 n. 4 (10th Cir. 2001).

Federal courts have dismissed cases with such conclusory allegations, and the U.S. Supreme Court has specifically condemned such threadbare statements masquerading as purported facts. *Ashcroft*, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); *see also Riddle v. Mondragon*, 83 F.3d 1197 (10th Cir. 1996) (affirming dismissal of the plaintiff's inadequate medical care claim because the plaintiff's conclusory allegations did not rise to the level of deliberate indifference); and *White v. Kansas Dept. of Corrections*, 664 Fed. Appx. 734 (10th Cir. 2016), *unpublished* (affirming the district court's dismissal of the plaintiff's complaint because the plaintiff's unsupported allegations failed to approach the deliberate indifference standard).

Notwithstanding Plaintiffs' boilerplate, generic allegations as to Defendant Turn Key, Plaintiffs fail to plead any factual basis sufficient to establish that there was any

"custom or practice" of Turn Key which caused any alleged constitutional deprivation. Instead, Plaintiffs attempt to establish facts in cases separate from the one at issue seemingly in an attempt to fabricate an alleged pattern of indifference. Plaintiffs' conclusory, irrelevant, and in many instances blatantly untrue allegations that Turn Key's policies or customs were inadequate or non-existent are insufficient to establish *Monell* liability. Such allegations fail to show that Turn Key executed any policy or custom that was the "moving force" behind any alleged constitutional deprivation as to Ms. Cross. Without pleading any such specific facts in support of their municipal liability claim, Plaintiffs' claims are far too vague and conclusory to state a plausible claim for relief.

The Tenth Circuit and other federal courts have made clear that "a 'single isolated incident' does not prove the existence of an unconstitutional policy or custom." *McClain v. Sheriff of Mayes Cty.*, 595 F. App'x 748, 753–54 (10th Cir. 2014), citing *Okla. City v. Tuttle,* 471 U.S. 808, 821, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). *See, also, Flanagan v. City of Dallas, Tex.*, 48 F. Supp. 3d 941, 948–49 (N.D. Tex. 2014) ("[A] municipality is almost never liable for an isolated unconstitutional act on the part of an employee"), citing *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001).

In order to state a valid § 1983 claim against Turn Key, Plaintiffs must allege facts sufficient to show that Turn Key implemented and followed a <u>specific policy</u> or custom that <u>caused</u> the alleged constitutional deprivation. *See Monell,* 436 U.S. at 694. *Monell* has stressed the importance of the "causation" element for municipal liability in stating that "Congress did not intend § 1983 liability to attach where such causation was absent." *Monell,* 436 U.S. at 692.  Plaintiffs have failed to plead facts sufficient to establish the

required element of causation. These allegations, on their face, are meant to argue that Defendant Sheriff and/or Defendant Turn Key had a policy or custom of inadequate treatment. This is not what the law states. Plaintiffs must plead a specific policy or custom was the driving force behind the constitutional deprivation, not that certain, unproven, allegations, create a de facto policy or custom. *See Monell,* 436 U.S. at 694.

Plaintiffs' reliance upon conclusory and irrelevant allegations in instances far afield of the case at issue, with no factual support or any nexus to the current case at issue, are insufficient as a matter of law. Because § 1983 applies only to state actors, factual contentions supporting state action are necessarily essential to stating a plausible claim for relief, and "mere conclusory allegations with no supporting factual averments are insufficient." *Ellibee v. Fox,* 244 Fed.Appx. 839, 843 (10th Cir. 2007). The factual allegations within the complaint must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell* at 570. For a complaint to have facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009). "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support of these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plaintiffs also allege that because Turn Key is a "for-profit" corporation, Turn Key

has *ipso facto* deprived every inmate, in every facility where Turn Key provides healthcare services, of a constitutional right to adequate medical care. This conclusory allegation is based on pure conjecture and is inconsistent with the law. The Tenth Circuit has expressly rejected the argument that operating a for-profit healthcare company is sufficient to prove deliberate indifference: "the naked assertion that Defendants considered cost in treating [an inmate's medical condition] does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Sherman v. Klenke*, 653 F. App'x 580, 592-93 (10th Cir. 2016), *unpublished*, (also holding: "Even if we were to consider this cost-cutting policy, the allegation is wholly conclusory and would not cause his claim against CHP to survive a motion to dismiss."). Citing to Tenth Circuit precedent, the District of Colorado has similarly dismissed such for-profit claims:

> Nowhere in the amended complaint do plaintiffs argue that the budget was the moving force behind defendants' decision not to send Mr. Grubbs to the hospital. Even if the budget were a cause, the mere existence of a budget does not demonstrate deliberate indifference. *Sherman v. Klenke*, 653 Fed.Appx. 580, 592 (10th Cir. 2016) ("The naked assertion that Defendants considered cost in treating [an inmate's] hernia does not suffice to state a claim for deliberate indifference") (citing Winslow v. Prison Health Servs., 406 Fed.Appx. 671, 674 (3d Cir. 2011) (unpublished)); see also *Morris v. Livingston*, 739 F.3d 740, 748 (5th Cir. 2014) ("[T]he deliberate indifference standard ... does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.") (quoting *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997)).

*Est. of Grubbs v. Weld Cnty. Sheriff's Off.*, No. 16-CV-00714-PAB-STV, 2017 WL 951149, at *4 (D. Colo. Mar. 8, 2017). Specific to the facts of *this case*, Plaintiffs made no allegation that cost of offsite treatment had any bearing on the individual medical staff's

decisions not to send Ms. Cross to the hospital.

Further, with regard to Plaintiffs' allegations that Turn Key had a custom of failing to train staff, the Tenth Circuit has made clear that liability attaches against a municipality under § 1983 "only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton Ohio v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 388-89 (1989). Such liability "attaches where – and only where – a *deliberate choice* to follow a course of action is made from among various alternatives by city policymakers … Only where a failure to train reflects 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* (emphasis added). Just as Plaintiffs have failed to plead facts sufficient to show that any policy, practice or custom was the moving force behind Ms. Cross's death, Plaintiffs have failed to plead facts sufficient to establish a claim against Turn Key for alleged failure to train. "As our precedent makes clear, proving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents 'difficult problems of proof,' and we must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*." *Connick v. Thompson*, 563 U.S. 51, 70, 131 S.Ct. 1350, 1365, 1719 L. Ed. 2d 417 (2011), citing *Bd. of County Comm'rs of Bryan County, Okl v. Brown*, 520 U.S. 397, 406, 117 S.Ct. 1382; *Canton*, 489 U.S., at 391-392, 109 S.Ct. 1197.

Plaintiffs have also failed to plead any facts to show a causal link between the generic customs Plaintiffs claim existed and Ms. Cross's death. Plaintiffs have failed to plead any facts sufficient to establish that a Turn Key policy, procedure, or custom was the "moving force" behind Ms. Cross's alleged constitutional deprivation. Further,

Plaintiffs have failed to allege any facts sufficient to show that a specific Turn Key policy or custom caused Ms. Cross to suffer an alleged constitutional deprivation. Plaintiffs do not identify any specific individual Turn Key policy which was violated and/or improper, nor do they identify any Turn Key individual who created and/or violated and such policies. Plaintiffs have failed to allege any facts sufficient to show that Ms. Cross's death from methamphetamine toxicity due to her willfully concealing a bag of methamphetamine was in any way causally related to any Turn Key policy, practice, or custom. Thus, Plaintiffs failed to state claims under § 1983 against Defendant Turn Key, and pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' claims against Defendant Turn Key should be dismissed as a matter of law.

## CERTIFICATE OF COMPLIANCE

In compliance with D.C.Colo.LPtR 17(c), this Brief contains 6,413 words.

## CONCLUSION

Dismissal of Plaintiffs' claims against Defendant Turn Key Health Clinics, LLC, is appropriate at this time, as Plaintiffs have failed to state a claim against Defendant upon which relief can be granted under federal law. Therefore, Defendant Turn Key Health Clinics, LLC, prays that this Court grant its motion, dismiss Plaintiffs' federal claim against Defendant, and decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claim. Defendant further moves this Court for any and all such relief as it is entitled under law.

Respectfully submitted,

Alexandra G. Ah Loy, OBA #31210
Tim Campbell, OBA #30513
SWEET DEWBERRY HUBBARD, PLC
24 West Park Place
Oklahoma City, Oklahoma 73103
(405) 601-9400 Office
(405) 601-9444 Facsimile
Email: allie@sdh.law
Email: tim@sdh.law
*Attorneys for Defendant Turn Key
Health Clinics, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the  30th day of December, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the registered ECF parties of record:

Anna C. Holland-Edwards
Erica Tick Grossman
Rachel Claire Kennedy
Holland Holland Edwards & Grossman P.C.
1437 North High Street
Denver, CO 80218
303-860-1331
Fax: 303-832-6506
anna@hheglaw.com
egrossman@johnhollandlaw.com
rachel@hheglaw.com

*Attorneys for Plaintiffs*

ALEXANDRA G. AH LOY