IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:22-cv-03143-DDD-NRN

THE ESTATE OF AMY LYNN CROSS, *et al.*,

    Plaintiff,

v.

TURN KEY HEALTH CLINICS, LLC, *et al.*,

    Defendants.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Amy Lynn Cross was arrested and booked in Weld County, Colorado, on September 3, 2021, for drug-related charges. She died while still in custody on September 5, 2021, from methamphetamine toxicity. Her Estate alleges that Turn Key Health Clinics, LLC—a contractor for the Weld County Jail—provided constitutionally insufficient medical care during her detainment. Turn Key moves for dismissal, saying the Estate's complaint did not plausibly allege a claim for municipal liability under 18 U.S.C. § 1983 and *Monell v. Department of Social Services*. 436 U.S. 658 (1978). The motion is denied.

### BACKGROUND[1]

Turn Key Health Clinics, LLC is a private health organization that contracts with prisons across the United States to provide medical services to inmates. Doc. 1 at ¶¶

---

[1] All facts described in this background are (1) taken from the complaint and accepted as true and (2) presented in the light most favorable to the Estate. *Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir. 2007).

21-25. In bidding for a contract with Weld County, Colorado, Turn Key lauded its ability to reduce "unwarranted" costs. *Id.* at ¶¶ 177-78. It pointed to its successes in Tulsa, Oklahoma, where it reduced operating costs by cutting down on transferring inmates to emergency rooms by 77% and reducing the days inmates spent in offsite hospitals by 35%. *Id.* After this presentation, Weld County contracted with Turn Key for it to provide its services to Weld County Jail inmates. *Id.* at ¶¶ 167, 177-78.

During intake on September 3, 2021, Ms. Cross alerted Turn Key nurses that she had recently taken methamphetamine, but she did not tell them that she had some meth on her person. *Id.* at ¶¶ 42-46. A Turn Key nurse noted Ms. Cross's condition: she appeared "irritable," was likely under the influence of fentanyl, was fidgety, and had an elevated pulse. *Id.* at ¶¶ 46-49. To monitor Ms. Cross's condition, a Turn Key nurse placed her on program for evaluating withdrawal symptoms. *Id.*

The next day, Ms. Cross's condition worsened. *Id.* at ¶¶ 50-54. Deputies called a Medical Code 5 (a medical emergency), and Turn Key nurses came to help Ms. Cross. *Id.* at ¶ 55. At the time, Ms. Cross had an elevated pulse of 152, had difficulty urinating, had chest pains, was fidgeting, and was sweating profusely. *Id.* at ¶¶ 59-64. She was moving too much to allow nurses to perform tests and to catheterize her. *Id.* at ¶¶ 65-72. "People in acute methamphetamine toxicity must be hospitalized for drug induced sedation" because their erratic muscle movements often make it difficult for doctors to treat them. *Id.* at ¶ 40. The nurses characterized Ms. Cross's behavior instead as a "refusal" to cooperate with medical staff. *Id.* at ¶¶ 67-72. Ms. Cross begged to be sent to the hospital. *Id.* at ¶ 68. Instead, Turn Key nurses had deputies take Ms. Cross back to her cell. *Id.* at ¶¶ 78.

Upon being returned to her cell, Ms. Cross told deputies that she was suicidal, which required deputies to do continual checks on her. *See id.* at ¶ 79. Deputies Kendra Betz and Hunter Aslin discussed Ms. Cross's symptoms, saying Turn Key nurses did not believe that some of Ms. Cross's symptoms were "real." *Id.* at ¶ 92. During her shift, Deputy Betz continued to update Turn Key nurses on Ms. Cross's

worsening symptoms. *Id.* at ¶¶ 95-102, 131-33. Deputy Betz became increasingly worried that Ms. Cross was not getting adequate care and sought advice from sergeants on how to better help Ms. Cross. *Id.* at ¶¶ 139-42. Their advice was to continue relying on Turn Key nurses. *Id.*

Ms. Cross's symptoms now included, off and on, her spewing some "brown muscussy stuff," foaming at the mouth, heavily sweating, laying on the floor without a shirt to cool down, "possibly choking," having blue fingers, becoming nonverbal to commands and questions, shaking, spasming, and fidgeting. *Id.* at ¶¶ 96, 102, 110-14, 131. Most of Ms. Cross's symptoms throughout the day are symptoms of methamphetamine toxicity, but Turn Key nurses characterized these symptoms differently. *Id.* at ¶¶ 40, 120-23, 131-32. They again concluded that Ms. Cross was fine, that her signs were "normal," that she was just cold, and that she was refusing to cooperate. *Id.* at ¶¶ 122-26, 132. Turn Key nurses agreed that she would not need hospitalization "regardless of how sick she became." *Id.* In their estimation, Ms. Cross was only "acting a fool." *Id.* at ¶ 87.

Ms. Cross died on September 5, 2021. *Id.* at ¶¶ 157. Deputy Betz called nurses to check on Ms. Cross late on September 4; she by then had low blood pressure (70/52) and shallow breathing. *Id.* at ¶¶ 143-47. Within minutes, Ms. Cross's heart had stopped. *Id.* at ¶¶ 148-53. Nurses called an ambulance and attempted CPR, but Ms. Cross was pronounced dead minutes after paramedics arrived. *Id.* at ¶¶ 148-53, 157.

## LEGAL STANDARDS

A court presented with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must decide whether the facts alleged in the complaint, if true, are sufficient to entitle the plaintiff to the legal remedy sought. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). The court must accept the well-pled facts alleged in the complaint as true and view them in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir. 2007). The court will not, however, accept conclusory

allegations that are unsupported by factual averments. *VDARE Found. v. City of Colo. Springs,* 11 F.4th 1151, 1159 (10th Cir. 2021). A complaint need not contain detailed factual allegations to state a claim for relief, but the facts alleged must be enough to raise a right to relief beyond mere speculation. *Twombly,* 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action" are insufficient. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## DISCUSSION

The Estate claims Turn Key deprived Ms. Cross of her constitutional rights as an inmate while under Turn Key's care. Under 42 U.S.C. § 1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." The Supreme Court extended Section 1983 to local governments and municipalities in *Monell v. Department of Social Services.* 436 U.S. 658 (1978). The Tenth Circuit—and all circuits who have reached the issue—extends *Monell* liability to private organizations acting on behalf of a municipality. *Dubbs v. Head Starts, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003). *Monell* liability does not attach on a theory of mere *respondeat superior*, however; a private organization must have a policy that "direct[ly] cause[s]" the constitutional violation. *Id.* at 1215-16.

For Turn Key to be liable under *Monell*, the Estate must first identify the unconstitutional policy. *Waller v. City & Cnty. of Denver,* 932 F.3d 1277, 1283-84 (10th Cir. 2019). This allegedly unconstitutional policy can take five forms:

(1) A formal regulation or policy statement;
(2) Informal custom that is "permanent and well settled as to constitute custom usage with the force of law";
(3) "[D]ecisions of employees with final policy making authority";
(4) A final decision maker's ratification of a decision made by an employee with delegated authority to make such a decision; and
(5) A failure to train.

*Id.* (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2020) (internal

- 4 -

references omitted)). Next, the Estate must allege that Turn Key's policy caused Ms. Cross to be deprived of her constitutional rights. *Id.* Finally, the Estate must allege that Turn Key was deliberately indifferent to inmates' constitutional rights. *Sherman v. Klenke,* 593 Fed. App'x 580, 590 (10th Cir. 2016); *but Waller,* 932 F.3d at 1284 (saying this element is only required "for claims of inadequate hiring, training, or other supervisory practices"). The Estate satisfies all three elements.

### A. Policy

Taking all the complaint's allegations as true, Turn Key has an unconstitutional policy of delaying inmates' medical care. The Estate hangs liability on three separate theories: a formal policy, an informal custom, and a failure to train. Without reaching the other two theories, I hold that the Estate plausibly alleges that Turn Key maintains a formal policy of delaying adequate healthcare to inmates.

The Estate alleges that "Turn Key maintains a custom, practice, and policy of disregarding and minimizing inmates' medical complaints . . . [and] failing to timely send patients to the hospital in order to save money and increase profits." Doc. 1 at ¶ 175. While the Estate can point to no specific policy where Turn Key avoids hospitalizing inmates, on the complaint it need not. The Estate points me to the Sixth Circuit's view that:

> "Given the allegations that [the Plaintiff] makes in h[er] complaint, it is not immediately clear what more [the Plaintiff] could have alleged with respect to the policies that [the Defendant] might or might not have. We wonder how [the Plaintiff] would necessarily know, at this point of h[er] *complaint*, and without the benefit of discovery, whether such custom or policy might exist, and if it does exist, what its contours might be or how exactly it effected a violation of h[er] constitutional rights."

*Petty v. Cnty. of Franklin,* 478 F.3d 341, 348 (6th Cir. 2007) (emphasis in original). Although the Sixth Circuit's view can still be persuasive, its standard is no longer good law. *See Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause

of action" are insufficient to survive a 12(b)(6) motion.).[2] But I agree that courts would be asking too much to require plaintiffs to have located an organization's internal policy "without the benefit of discovery." *Petty,* 478 F.3d at 348. I am not aware of many private organizations in the habit of publishing their damning internal policies in places where potential litigants can retrieve them. The Estate must still have more than an allegation that some policy exists.

The Estate does not rely merely on a conclusory allegation that the policy exists. It buttresses its allegation by identifying eighteen instances where Turn Key employees delayed care resulting in inmates suffering medical complications. Doc. 1 at ¶¶ 184-202 (alleging there were "at least a hundred"). Plaintiffs can plausibly allege unconstitutional policies using prior instances of the defendants' misconduct even if those allegations stem from nonparties. *Quintana v. Santa Fe Bd. of Comm'rs,* 973 F.3d 1022, 1034 (10th Cir. 2021) (three prior instances by nonparties, eight prior instances by the deceased). When identifying these prior instances, the plaintiff must plead "specific facts" like the names of the parties, the circumstances of the claims, and the alleged misbehavior. *Andersen v. City of Colo. Springs,* No. 20-cv-02032, 2021 U.S. Dist. LEXIS 258224, at *14-*15 (D. Colo. Aug. 12, 2021) (distinguishing se from *Metzler v. Colo. Springs,* No. 19-cv-00878f, 2020 U.S. Dist. LEXIS 19151, 2020 WL 533735 (D. Colo. Feb. 3, 2020, *aff'd on other grounds* 841 Fed. App'x 94 (10th Cir. 2021)). These prior instances must also be similar to the plaintiff's claim to plausibly allege an unconstitutional policy. *Quintana,* 973 F.3d at 1034; *see Connick v. Thompson,* 563 U.S. 51, 62-63 (2011) (rejecting a claim because the other alleged cases were not "similar to the violation at issue here").

The Estate adequately does so. The complaint lists specific characteristics for each

---

[2] The Sixth Circuit decided *Petty* before the Supreme Court decided either *Twombly* or *Iqbal*, but other judges in this District post-*Twombly* and *Iqbal* have found *Petty* still persuasive. *McGill v. Corr. Healthcare Cos.,* No. 13-cv-01080, 2014 U.S. Dist. LEXIS 87819, at *28-*29 (D. Colo. June 27, 2014) ("[A] 'district court's dismissal of a civil rights complaint on a 12(b)(6) motion is scrutinized with special care.'") (quoting *Petty,* 478 F.3d at 348).

of the eighteen cases like plaintiffs' names, circumstances of their incarceration and eventual medical complications, and the alleged misbehavior by Turn Key employees. *Andersen,* 2021 U.S. Dist. LEXIS 258224, at *14-*15. Not all eighteen cases the Estate identifies are similar to Ms. Cross's, though. Doc. 1 at ¶¶ 188-89. For example, Turn Key employees allegedly kept an inmate, who was later found dead, restrained due to potentially dangerous "delusions and hallucinations." *See id.* at ¶ 188. The Estate does identify, however, at least nine cases with facts similar to Ms. Cross's. *Id.* at ¶¶ 185-87, 190, 193, 195, 198, 200-01. These cases each involve some variation of the following facts which appear here:

- Turn Key employees accusing inmates of faking their symptoms;
- Non-medical professionals pleading with Turn Key employees to further assist inmates;
- Inmates begging Turn Key employees to take them to the hospital;
- Inmates complaining of symptoms for hours on end;
- Inmates manifesting visible symptoms for hours on end;
- Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; and
- Turn Key employees delaying in hospitalizing inmates leading to their deaths and disabilities.

*Compare id. with id.* at ¶¶ 87, 92; 139-42; 68-71; 82, 136; 46-49, 97, 113-14, 131-32, 147; 43-46. Turn Key argues that none of these cases have reached judgment. But just as complaints are filed for many, even frivolous, reasons, so too are cases dismissed or settled for many reasons other than lack of liability. *See Andersen,* 2021 U.S. Dist. LEXIS 258224, at *15. These cases across the United States paint a plausible picture that Turn Key delays medical care to inmates to reduce financial costs even at the occasional human cost of their inmates' lives. Doc. 1 at ¶ 201; *see Bailey v. Turn Key Health Clinics, LLC,* No. 20-cv-0561, 2021 U.S. Dist. LEXIS 177310, at *15, *18-*19 (N.D. Okla. Sep. 17, 2021) (Turn Key employees sent the plaintiff to the hospital only after she agreed to pay for her own treatment.); *Cf.*

*Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 794 (Private corporations working in prisons "have financial incentives to save money at the expense of inmates' well-being and constitutional rights.").

Turn Key counters that Section 1983 liability cannot attach on the mere allegation of financial motive. Doc. 14 at 19 (citing *Sherman v. Klenke,* 653 Fed. App'x 580, 591-92 (10th Cir. 2016)). It is true that a plaintiff alleging that a provider considered cutting costs to avoid providing constitutionally sufficient care is a "wholly conclusory" "naked assertion." 653 Fed. App'x at 592-93. The Estate more than just "naked[ly] assert[s]" a "wholly conclusory" financial motive, however. It supports its conclusion by pointing to a statement Turn Key itself made—and marketed itself on—about how it avoids hospitalizing inmates to lower costs. Doc. 1 at ¶ 177. This allegation is not just conclusory because the Estate support it with Turn Key's own words. *Id.*; s*ee VDARE,* 11 F.4th at 1159 (Conclusions are acceptable if supported by factual averments.). Businesses will, moreover, occasionally make decisions that they know will open themselves up to liability if they believe doing so will save money. *See Grimshaw v. Ford Motor Co.,* 174 Cal. Rep. 348, 360-62, 382 (Ct. App. 1981) (A defendant "may find it more profitable to treat compensatory damages as part of the cost of doing business rather than to remedy the defect."). Businesses calculate that they may save money by implementing liability-inducing decisions that cost less than the alternatives. *See id.* Turn Key could have made this calculus. Doc. 1 at ¶¶ 177-78, 201. Turn Key plausibly alleges that Turn Key has financial motives to maintain a policy of delaying hospitalizing inmates across the country.

### B. Causation

The Estate argues that Turn Key's policy of delaying inmates' proper medical care caused Turn Key employees to delay Ms. Cross's proper medical care. If a policy is unconstitutional on its face, the plaintiff "puts an end to the question" of causation. *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998) (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997)). Alternatively, if a policy would have

the obvious consequence of a constitutional violation, the causation element is also satisfied. *See Finch v. Rapp,* 38 F.4th 1234, 1244 (10th Cir. 2022).

Ms. Cross died because, as her Estate alleges, Turn Key's policy is to delay in providing inmates proper healthcare. A delay in medical treatment by prison staff is unconstitutional if it results in "substantial harm." *Estate of Beauford v. Mesa Cnty.,* 35 F.4th 1248, 1262 (10th Cir. 2022) (quoting *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005)). Death constitutes substantial harm. *Id.* at 1268.

The Estate alleges that Turn Key's policy caused Ms. Cross substantial harm: her death. The complaint points to three cases where Turn Key delayed medical care resulting in the inmates' deaths—four including Ms. Cross's. Doc. 1 at ¶¶ 151, 195, 198, 200. Other cases resulted in alternate "substantial[ly] harm[ful]" medical conditions like paralysis and comas. *Id.* at ¶¶ 185, 187, 190; *see Beauford,* 35 F.4th at 1268 (Substantial harm includes lifelong handicaps). If Turn Key maintains a policy of delaying care, on its face that policy would result in some inmates dying or becoming disabled from the delay. Such a policy is facially unconstitutional because the delays result in "substantial harm" to some inmates. *Beauford,* 35 F.4th at 1262. Alternatively, the obvious consequence of Turn Key's policy in delaying proper medical treatment is that some inmates will face substantial harm from lack of timely treatment. *Id.* at 1268. As alleged, Turn Key's unconstitutional policy of delaying care caused Ms. Cross's death.

Turn Key asserts that Ms. Cross caused her own death. It reminds me—seven times—that "Ms. Cross had smuggled a bag of methamphetamine into her vagina prior to booking . . . deliberately with[olding] this information" from the Turn Key nurses. Doc. 14 at 3, 5-6, 11. Smuggling drugs within one's body can result in overdoses or toxicity if the bag breaks open (as it did here), *Id.* at ¶ 161, and Turn Key cannot be liable for Ms. Cross's own dangerous misbehavior. *McClain v. Sheriff of Mayes City,* 595 Fed. App'x 748, 752-53 (10th Cir. 2014) (Inmates who "thwart[] jailers' efforts to protect inmate safety" cannot claim they were unconstitutionally unsafe in prison.). The bag, however, is irrelevant. Perhaps if Ms. Cross alerted the

Turn Key nurses to the bag they would have sped up her treatment. Turn Key ignores, however, that Ms. Cross exhibited symptoms of methamphetamine toxicity throughout her stay in Weld County Jail after telling Turn Key nurses that she had recently taken meth. Doc. 1 at ¶¶ 39-40, 43-46, 59-64, 97, 113-14, 131-32. She was not the only Weld Count inmate who took drugs, either; Weld County Jail "had serious problems with illicit drugs being smuggled into the jail and traded among the inmate[s]." *Id.* at ¶ 37. Whether the toxicity came from drugs Ms. Cross took outside jail rather than inside is irrelevant. What matters is that she was experiencing toxicity, that she exhibited symptoms of toxicity, and, most importantly, that Turn Key nurses should have taken quicker action. The Estate plausibly alleges that Turn Key employees delayed hospitalizing Ms. Cross for her methamphetamine toxicity because of Turn Key's policy.

### C. Deliberate Indifference

The Estate charges that Turn Key is deliberately indifferent to inmates'—and by extension Ms. Cross's—constitutional right to proper medical care in prison. Deliberate indifference is something akin to a reckless standard requiring both an objective and subjective test. *McClain v. Sheriff of Mayes Cnty.,* 595 Fed. App'x 748, 753 (10th Cir. 2014) ("'Deliberate indifference' is a subjective test 'equal to recklessness.'") (quoting DeSpain, 264 F.3d 965, 972 (10th Cir. 2001)). Objectively, the Estate must plausibly allege that Turn Key violated an established constitutional right. *Finch v. Rapp,* 38 F.4th 1234, 1243 (10th Cir. 2022). Subjectively, the Estate must plausibly allege that Turn Key knew the risk that its policy could be substantially harmful to inmates. *See Beauford,* 35 F.4th at 1262-63. A pattern of tortious conduct by employees would have put Turn Key on notice of the risk and satisfy the subjective test. *Finch,* 38 F.4th at 1244.

The Estate plausibly alleges that Turn Key's policy violated clearly established constitutional law. Objectively "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Beauford,* 35 F.4th at 1268-69 (quoting *Mata,* 427 F.3d at 749) (alterations in original). Ms.

Cross had a serious medical need as she slowly died of methamphetamine toxicity, and Turn Key nurses did not seek hospitalization until she was almost already dead. Doc. 1 at ¶¶ 156-57. Subjectively, Turn Key was on notice that its employees were continuing to delay in treatment. *Finch,* 38 F.4th at 1244. Turn Key knew from 2009 to 2019 that delaying in providing inmates' medical treatment could result in substantial harm to those inmates. Doc. 1 at ¶¶ 185-202. As the Estate's complaint plausibly alleges, Turn Key knew the risk that its custom could result in inmates' deaths or disabilities and continued the policy for ten years regardless. This policy, as alleged, caused Ms. Cross's death and violated her constitutional rights.

## CONCLUSION

It is ORDERED that:

Turn Key Health Clinic, LLC's Motion to Dismiss for Failure to State a Claim (Doc. 13) is DENIED.

DATED: July 18, 2023                BY THE COURT:

_____

Daniel D. Domenico
United States District Judge