**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-3143-SKC-SBP**

THE ESTATE OF AMY LYNN CROSS, et al

      Plaintiffs,

v.

TURN KEY HEALTH CLINICS, LLC, et al

      Defendants.

---

## PLAINTIFFS' MOTION TO COMPEL

---

### I.  BACKGROUND & INTRODUCTION

This is an action under 42 U.S.C. §1983 arising from Amy Cross's protracted and avoidable death in the Weld County Jail on September 5, 2021. Despite knowing of obviously emergent symptoms, despite deputies calling medical staff repeatedly with concerns about Ms. Cross's worsening condition and declaring two medical emergencies, Individual Defendants disregarded her symptoms as fake. They pre-determined not to hospitalize Ms. Cross because they believed she was "acting a fool." No ambulance was called until she was already dead. ECF 1, ¶¶ 50-157.

It is a basic principle of §1983 law that Turn Key is only subject to §1983 liability *if* plaintiffs can prove not only the underlying constitutional violations, but *also* that Turn Key's policies or customs were the moving force behind them. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1143-45 (10th Cir. 2023);

1

*Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048-1051 (10th Cir. 2022); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215-16 (10th Cir. 2003) (finding evidence sufficient to demonstrate policy and practice of private defendants fulfilling a government function). As the Tenth Circuit stated:

> The [municipal] deliberate indifference standard is satisfied "when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." "[A]bsent a pattern of unconstitutional behavior," deliberate indifference can be found "only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." Such a pattern is necessary because, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Evidence of "a pre-existing pattern of violations" is only rarely unnecessary, and then only "in a narrow range of circumstances" in which "the unconstitutional consequences of failing to train" are "highly predictable" and "patently obvious."[1]

It is axiomatic that plaintiffs are entitled to conduct discovery on their claims – especially those which have survived a motion to dismiss as here. Fed. R. Civ. P. 26(b)(1); *Chilcoat v. San Juan Cty.*, 41 F.4th 1196, 1219-21 (10th Cir. 2022) (reversing denial of leave to amend and remanding for further proceedings, including allowing plaintiff to explore *Monell* claim in discovery). As the Tenth Circuit reasoned in *Quintana v. Santa Fe County Board of Commissioners*:

> Of course, we cannot determine from the face of the proposed amendment whether the plaintiffs will be able to substantiate

---

[1] *Wright v. City of Ponca City*, No. 22-6137, 2023 U.S. App. LEXIS 23735, at *18-19 (10th Cir. Sep. 7, 2023) (*quoting Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019); *Connick v. Thompson*, 563 U.S. 51, 62-64 (2011)).

their *Monell* claim. But a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. So we conclude – given the low threshold for amendment and low bar for surviving a motion to dismiss – the **plaintiffs alleged enough to explore their *Monell* claim in the discovery process**.

973 F.3d 1022, 1034 (10th Cir. 2020) (internal quotes and citations omitted).

Plaintiffs' requests are narrowly tailored and properly seek records that are routinely discoverable in §1983 cases. The disputed discovery[2] relates to the circumstances surrounding Ms. Cross's death, and, just as crucially, is targeted at establishing Turn Key's liability for its own policies and customs. This dispute concerns three categories of documents: (1) Morbidity & mortality reviews ("sentinel events"); (2) Defendants' personnel files; and (3) Contract and Budget documents.

Records concerning expenditures on healthcare, contract performance, and assessments of the circumstances surrounding serious injuries and deaths, the appropriateness of clinical care, and determinations of whether to make changes in policy, procedure, or practice are directly relevant to Plaintiffs' claims for unconstitutional health care, as they could indicate that Turn Key knew of systemic problems in its facilities that posed a substantial risk of harm to inmates, and that its failure to remedy those problems resulted in Ms. Cross's death. *Prince*, 28 F.4th at 1050-51; *Tanner v. McMurray*, 405 F. Supp. 3d 1115, 1211-12, n.26 (D.N.M. 2019). Indeed, the critical relevance of the discovery sought by Plaintiffs was essentially

---

[2] *See* **Ex. 1**, pp. 26-28, 30; **Ex. 2**, pp. 7-10, 12.

admitted by Turn Key in its unsuccessful 12(b)(6) effort to dismiss the *Monell* claim against it for an alleged lack of specific, concrete and exemplary evidence demonstrating widespread and customary practices, *de facto* policies, notice of training deficiencies, and other relevant evidence. *See* ECF 14.

Turn Key's objections generally concern the relevance, scope, and proportionality of Plaintiffs' discovery. It sharply limited its responses, asserting that "any discovery beyond Weld County Detention Center prior to September 2021 has no relevance to this lawsuit and would have no probative value over any of the material issues in this case, nor is any such discovery proportional to the needs of this case," and has refused to produce sentinel event records, complete personnel files, or contract documents that do not specifically mention Ms. Cross.[3]

However, as the Court understands, establishing *Monell* liability is an arduous task requiring much more than proof of an underlying constitutional violation. Plaintiffs must demonstrate a widespread custom and practice – which necessarily involves considering incidents and trends beyond Ms. Cross's death – exactly as Defendant pointed out in moving to dismiss. Yet to complete the paradox, Defendant

---

[3] Turn Key also objects "to the extent the documents sought are protected from disclosure by attorney-client privilege, the work product doctrine, and/or were prepared in anticipation of litigation." **Ex. 1**, pp. 26-28; **Ex. 2**, p. 12. Because no privilege log has been tendered, Plaintiffs cannot assess the applicability of these privileges. Fed. R. Civ. P. 26(b)(5); *Horton v. United States*, 204 F.R.D. 670, 673 (D. Colo. 2002) ("[T]he party asserting the privilege must provide a privilege log that describes in detail the documents or information claimed to be privileged and the precise reasons the materials are subject to the privilege asserted.").

attempts create a catch-22 by blocking this discovery, and will undoubtedly move for summary judgment claiming there is insufficient evidence of a pattern and practice.

Defendant's arguments about relevance are premature – the rules pertaining to discovery are to be liberally construed. Courts "must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." Fed. R. Civ. P. 26 advisory committee note. "Relevancy in the discovery context is broader than admissibility of evidence at trial." *A.H. v. Evenflo Co.*, No. 10-cv-02435-MSK-KMT, 2011 U.S. Dist. LEXIS 93936, at *9 (D. Colo. Aug. 23, 2011); *see also* Fed. R. Civ. P. 26(b)(1); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir. 1995) ("The scope of discovery under the federal rules is broad."); *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 382 (D. Kan. 2005) ("discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party.").

Further, given that Counsel for Defendant represented in Court that he has not seen these documents, it is clear their potential relevance has not even been assessed. Indeed, Counsel for Defendant adamantly refused to concede that *any* other mortality reviews would be relevant or proportional to this case.

Turn Key also asserts boilerplate overbreadth, proportionality, and burden objections, in addition claiming that some documents may protected from disclosure by HIPAA.[4] It complains that the requests outlined above are "overly broad and

---

[4] As discussed at the last two discovery hearings, HIPAA specifically provides that

unduly burdensome," without consideration of the issues at stake or the arduous proof requirements of Plaintiffs' *Monell* claims, and without satisfying its obligation to provide sufficient detail and explanation about the nature of the burden relative to Plaintiffs' need for them. *See Lykins v. Certainteed Corp.*, No. 11-2133, 2012 U.S. Dist. LEXIS 115145 at *27 (D. Kan., August 16, 2012) ("A party resisting discovery as overbroad or unduly burdensome has the burden to show the validity of its objections" with factual information in light of the need for the information.).[5]

In attempting to justify its objections and limited responses to Plaintiffs' *Monell*-directed requests, Defendant recycles dismissal arguments that were already rejected by the Court and attempts to support those arguments with circular reasoning – asserting Plaintiffs should not be allowed discovery into the *Monell* claims because there is no evidence supporting these claims. **Ex. 4**, p. 8; *compare* **Ex. 3** and **Ex. 4**. It posits Plaintiffs' allegations are implausible because they include facts

---

protected health information can be disclosed in judicial or administrative proceedings upon entry of a protective order approved by the court, such as here. 45 C.F.R. § 164.512(e)(1); *see Lobato v. Ford*, No. 05-cv-01437-LTB-CBS, 2007 U.S. Dist. LEXIS 98121, at *11-12 (D. Colo. Nov. 9, 2007); *Tanner*, 405 F. Supp. 3d at 1211-12, n.26 (ordering production of unredacted records because "[a] protective order will sufficiently protect patient information without harming Tanner's ability to follow up with discovery leads"); *Gumm v. Sellers*, No. 5:15-cv-00041-MTT-CHW, 2017 U.S. Dist. LEXIS 200016 (M.D. Ga. Nov. 21, 2017) (allowing one inmate's counsel to obtain disclosure of medical, mental-health, and institutional files of eleven other inmates).
[5] Turn Key's boilerplate objections are inadequate and "tantamount to not making any objection at all." *Bautista v. MVT Servs.*, Civil Action No. 16-cv-01086-NYW, 2017 U.S. Dist. LEXIS 79752, at *14 (D. Colo. Mar. 20, 2017) (*quoting Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, No. 07-cv-00066-MSK-CBS, 2008 U.S. Dist. LEXIS 106695, 2008 WL 795815, at *5 (D. Colo. Mar. 21, 2008); *see* **Exs. 1 & 2** (responses to RFPs 14, 18, 20 & 23).

alleged in other lawsuits which did not result in a judgment against the company. **Ex. 4**, pp. 4-7. However, there is no plausibility threshold which must be crossed before a party is entitled to discovery, and this argument was already expressly rejected in the Court's Order Denying Turn Key's Motion to Dismiss. *Finch v. Rapp*, 38 F.4th 1234, 1245 n.2 (10th Cir. 2022) ("We note that there is no need for a plaintiff to provide evidence of successful constitutional litigation to prove a municipal liability claim."); **Ex. 3**, pp. 7-8.

The materials sought are highly relevant to Plaintiffs' civil rights claims and in the exclusive control of Turn Key. The discovery requests are appropriately narrow in time and scope. Plaintiffs have not requested documents from every death that has ever occurred at any Turn Key facility, or contract and budget records from each jail Turn Key has ever worked with – rather, Plaintiffs have limited requests to sentinel event records generated during a three-year period at Weld County Jail, sentinel event records for the nine inmates Judge Domenico included in his Order Denying Turn Key's Motion to Dismiss, personnel files of the four Individual Defendants, and documents concerning the three-year contract between Turn Key and Weld County. **Ex. 1**, pp. 26-28, 30; **Ex. 2**, pp. 7-10, 12.[6]

## II.  ARGUMENT

### A.  The Court Should Compel Mortality and Sentinel Event Records

---

[6] Plaintiffs note that the Court gave the parties 20 pages for these motions. ECF 75.

Reviews of serious injuries and deaths at Weld County Jail and other Turn Key facilities are highly relevant to Plaintiff Estate's *Monell* claims, as "they may indicate patterns in [Turn Key's] or [Weld County Jail's] responses to emergent health situations, their monitoring of inmate health, their reporting mechanisms, and their provision of care." *Tanner*, 405 F. Supp. 3d at 1212. ████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████ **Ex. 5**, pp. 1-2, 6.

Courts routinely recognize that litigants asserting *Monell* theories are entitled to correspondingly broad discovery in aid of their claims. For instance:

- In *Estate of Cespedes v. Armor Corr. Health Servs.*, Judge Jackson granted plaintiffs' request for mortality reviews and other continuous quality improvement records across all Armor facilities from 2015 through 2019, specifically ordering Armor Correctional Health Services to "**produce mortality reviews to the extent they exist for the 150 facilities**."[7]

- In *Tanner*, Judge Browning ordered Defendants to produce CQI documents and mortality reviews of other patients, reasoning CQI records "could indicate that [Defendants] knew of problems in the operation of Metropolitan Detention's medical facility and could indicate whether the Defendants took effective measures to correct those problems. . . .," and "**[mortality reviews] may indicate patterns in Correct Care's or Metropolitan Detention's responses to emergent health situations, their monitoring of inmate health, their reporting mechanisms, and their provision of care**."[8]

- In *Laintz v. Corr. Health Partners*, Judge Varholak ordered the production of all mortality, morbidity, or similar type reviews within a five-year span **from all facilities at which Wellpath provided the medical services**, emphasizing:

---

[7] **Ex. 6**, pp. 2, 4.
[8] 405 F. Supp. 3d 1115, 1209, 1212 (D.N.M. 2019).

The second argument is whether or not [mortality reviews are] relevant, and here I conclude that they are. Plaintiff has pled a *Monell* claim and . . . everybody agrees, in order to prove their *Monell* claim, they need to demonstrate a policy or practice that would link liability to the municipality as opposed to simply individual liability. And these documents are certainly possibly relevant to that.

**these mortality reviews are discussing the care of inmates and what has happened to those inmates and whether or not the care was improper and whether or not there is any indication that there is a pattern or policy or custom that led to any improper care. That goes to the very heart of the *Monell* claim. And indeed, I don't know how plaintiff could possibly pursue their *Monell* claim without documents similar to this**.[9]

- In *Estate of Walter v. Corr. Healthcare Cos.*, Judge Varholak ordered Correctional Healthcare Companies to produce the mortality reviews of other patients, and **information about deaths and lawsuits in other CHC facilities**.[10]

- In *Rehberg v. City of Pueblo*, Magistrate Judge Mix overruled objections based on undue burden, overbreath, and others where plaintiff's *Monell* theories required gathering years-worth of evidence from a police department, specifically emphasizing that plaintiffs are entitled to explore *Monell* claims in discovery, regardless of whether Defendants think the claims are plausible:

    The threshold for discovery on *Monell* claims remains the same as before *Iqbal*: "parties may obtain discovery regarding any nonprivileged matter that is relevant to any parties' claim or defense. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). It goes without saying that the standard limitations on discovery — *i.e.*, that it cannot be unduly burdensome, unreasonably cumulative or duplicative or more conveniently obtained from another source — also remain. *See* Fed. R. Civ. P. 26(b)(2)(C). **But there is simply no "plausibility" threshold which must be crossed before a party is entitled to discovery, unless the claim lacks sufficient plausibility such that it fails to survive a motion to dismiss**.[11]

---

[9] **Ex. 7**, pp. 19-20.

[10] **Ex. 8**, p. 2.

[11] No. 10-cv-00261-LTB-KLM, 2011 U.S. Dist. LEXIS 58776, at *10-13 (D. Colo. June 2, 2011) ("While Defendant City invites me to first qualify the validity of such a claim, it has often been recognized that discovery should not be prohibited merely because

- In *Edwards v. Armor Corr. Health Servs.*, the Florida District Court ordered Armor Correctional Health Services to provide plaintiffs with three years' worth of financial records and mortality review findings **from all jails operated by the Broward Sheriff's Office**;[12]

- In *Bost v. Wexford Health Sources, Inc.*, the Maryland District Court denied summary judgement of a *Monell* claim, writing "the issue here is whether Wexford had a pattern and practice of failing promptly to procure off-site emergency care for an inmate whose symptoms suggested such care was medically necessary. For this claim, it makes no difference whether the patient's need for emergency care was the result of a heart attack, a stroke, or some other medical condition. . . . Wexford is free to argue at trial that the sixteen cases are factually distinct from the circumstances pertaining to Ms. Neal, and therefore do not equate to a pattern or practice of unconstitutional medical care. But, such contentions are for the jury to resolve." In an earlier discovery order, the court emphasized **it is an "unremarkable proposition that a plaintiff pursuing a *Monell* claim is entitled to discovery beyond the circumstances of his or her own case," and that plaintiff should receive documents concerning instances of inadequate medical care for persons other than [plaintiff]**."[13]

- In *Fields v. City of Chi.*, the Illinois District Court held that the plaintiff was entitled to a new trial on a *Monell* claim because rulings limiting discovery into prosecutors' files in other cases "made it virtually impossible for him to establish that the City had a 'policy' of concealing exculpatory evidence, **an element required to prove his *Monell* claim**." [14]

- In *Herriges v. Cty. of Macomb*, the Michigan District Court allowed discovery into deaths by suicide at the Macomb County Jail **over the course of 10 years**, holding "Plaintiff easily clears the low bar of relevancy; the Reports of other inmates who committed suicide . . . are relevant to plaintiff's *Monell* claim alleging

---

it relates to claims that the defense asserts are based on an insufficient theory. *Alexander v. FBI*, 194 F.R.D. 316, 326 (D.D.C. 2000); 8 Charles Alan Wright et al., *Federal Practice and Procedure* § 2008, at 137 & n.33 (2010).").

[12] No. 14-CV-61577-BLOOM/VALLE, 2015 U.S. Dist. LEXIS 94791, at *3 (S.D. Fla. July 21, 2015); **Ex. 9**, pp. 2, 7. The Broward Sheriff's Office currently manages four county jails. www.sheriff.org/DOD/Pages/Facilities.aspx

[13] *Bost v. Wexford Health Sources, Inc.*, Civil Action No. ELH-15-3278, 2022 U.S. Dist. LEXIS 168152, at *152-53, 156 (D. Md. Sep. 16, 2022); 2020 U.S. Dist. LEXIS 66670, at *39 (D. Md. Apr. 15, 2020).

[14] No. 10 C 1168, 2015 U.S. Dist. LEXIS 189573, at *15-17 (N.D. Ill. Apr. 6, 2015)

a policy, custom, and practice of deliberate indifference to the psychological needs of suicide-prone inmates.'"[15]

- In *Boyer v. Advanced Corr. Healthcare, Inc.*, the Wisconsin District Court ordered discovery regarding **25 settled lawsuits involving allegations that the detainee was seriously injured or died because they received only limited treatment and were not referred to outside care that occurred in various facilities that ACH serviced around the country**. The court reasoned:

> The alleged policies at issue in this case all relate to whether defendants had a pattern and practice of discouraging the provision of off-site emergency care for detainees whose symptoms suggested such care was medically necessary. So, it makes no difference whether the inmate's need for outside emergency care or treatment in these other cases was the result of a cardiac issue or some other medical condition, or even if it resulted in a similar injury. Each of the ACH lawsuits identified by Boyer involved ACH's alleged failure to refer a detainee with a serious or emergent medical condition for outside care, resulting in a catastrophic outcome for the detainee.
> . . .
> Defendants also point out that some of the incidents post-dated Christine's death, meaning they could not have notified defendants of any unconstitutional practice relevant to Christine. **But the fact that some incidents occurred after Christine's death plausibly suggests a continuity in municipal policy so that what happens after the event may cast some light on what the policy was prior to the event**.
>
> In sum, even if some of the incidents identified by Boyer are sufficiently distinct from the facts pertaining to this case, he has alleged more than enough examples to create a plausible inference that defendants have a policy or pattern of discouraging outside medical care.
> . . .
> ACH's argument that delving into other medical incidents would result in a number of mini trials also is unpersuasive at this stage of the litigation. **Evidence of other incidents is often the only way a plaintiff can prove a pattern of unconstitutional conduct and deliberate indifference**.[16]

---

[15] No. 19-12193, 2020 U.S. Dist. LEXIS 146663, at *5 (E.D. Mich. Aug. 14, 2020).
[16] No. 20-cv-1123-jdp, 2023 U.S. Dist. LEXIS 103082, at *12-22, 26-36 (W.D. Wis. June 13, 2023) (Emphases added) (internal quotes and cites omitted). *See also*, *Boyer*

Where, as here, a private correctional healthcare company contracts with many facilities, and plaintiffs allege that it maintains *company-wide* policies and customs that result in constitutional violations across its facilities, discovery appropriately extends to the many spaces in which the company operates. *See, e.g.*, **Ex. 6**; **Ex. 7**; **Ex. 8**; *see also*, *Edwards* and *Boyer*, *supra*.

Defendant argues similar incidents are irrelevant because they involved different medical conditions or different staff in other jails. But the exact opposite is true. Because these incidents occurred across Turn Key facilities, over the course of several years preceding Ms. Cross's death, and involved many of their staff, it is even more plausible the complained of practices are widespread, longstanding corporate customs that caused the violation of Ms. Cross's rights. *See Bailey v. Turn Key Health Clinics, LLC*, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021) (denying dismissal of *Monell* claim where "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care.").

What matters is the pattern of *Turn Key staff's conduct* in response to serious

---

*v. Advanced Corr. Healthcare, Inc.*, No. 20-cv-1123-jdp, 2024 U.S. Dist. LEXIS 51436 (W.D. Wis. Mar. 21, 2024) (considering whether to sanction ACH for misleading statement about tracking deaths, and amending scheduling order to allow time for discovery regarding more than 400 deaths in facilities across the country).

medical symptoms and conditions – not whether the symptoms and conditions were the exact same as what they saw with Ms. Cross, or whether the patient was in the same facility, or if the incident involved the same employees. Turn Key's assertion that discovery should be limited to one month at the Weld County Jail fails to consider Plaintiffs' burden and contravenes common sense. It is akin to a police department arguing *Monell* discovery should be limited to a single precinct, or a school district arguing discovery should be limited to a single school.

As Judge Domenico found, Plaintiffs plausibly alleged Turn Key "has financial motives to maintain a policy of delaying hospitalizing inmates across the country," and specifically highlighted "nine cases with fact similar to Ms. Cross's," which "each involve some variation of the following facts which appear here:

- Turn Key employees accusing inmates of faking their symptoms;
- Non-medical professionals pleading with Turn Key employees to further assist inmates;
- Inmates begging Turn Key employees to take them to the hospital;
- Inmates complaining of symptoms for hours on end;
- Inmates manifesting visible symptoms for hours on end;
- Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; and
- Turn Key employees delaying in hospitalizing inmates leading to their deaths and disabilities."

**Ex. 3**, pp. 7-8. Judge Domenico obviously found consideration of Turn Key's care in its other facilities appropriate, holding: "These cases *across the United States* paint a plausible picture that Turn Key delays medical care to inmates to reduce financial

costs even at the occasional human cost of their inmates' lives. [17] Doc. 1 at ¶ 201; *Bailey v. Turn Key Health Clinics, LLC*, No. 20-cv-0561, 2021 U.S. Dist. LEXIS 177310, at *15, *18-*19 (N.D. Okla. Sep. 17, 2021) (Turn Key employees sent the plaintiff to the hospital only after she agreed to pay for her own treatment.)"

Plaintiffs have already conservatively limited their requests – RFP 14 seeks reviews relating to serious injuries and deaths in the Weld County Jail during the *three years* Turn Key was the medical provider, and RFP 23 requests the reviews of only the *nine patients* Judge Domenico found relevant in his Order denying Turn Key's Motion to Dismiss.[18] **Ex. 1**, pp. 26-28; **Ex. 2**, p. 12; **Ex. 3**, pp. 6-7. There is no reason for the Court to impose any additional limitations beyond those Plaintiffs have already voluntarily adopted, as they are significantly more conservative than the discovery limitations imposed in the cases portraited above. Given that the *Monell*

---

[17] This case is distinguishable from *Lucas*, where the Plaintiff cabined her *Monell* allegations to problems at the Tulsa County Jail, and the Tenth Circuit found the cost-cutting policy allegations insufficient. 58 F.4th 1127, 1143-46 (10th Cir. 2023). Unlike in *Lucas*, Plaintiffs in the instant matter support their allegations about Turn Key's cost-cutting policies across facilities "by pointing to a statement Turn Key itself made—and marketed itself on—about how it avoids hospitalizing inmates to lower costs." **Ex. 3**, p. 8; Doc. 1 at ¶ 177.

[18] In the Complaint Plaintiffs detailed 18 instances (culled from many more available examples) wherein Turn Key employees disregarded and minimized medical complaints, failed to order testing when known to be necessary, refused to timely send patients to the hospital, and used nurses to practice medicine dangerously outside their scope. Complaint, ¶¶ 185, 186, 187, 189, 190, 192, 200, 202 (pattern of ignoring repeated pleas for medical assistance); *Id.* at ¶¶ 186, 190, 193 (treating symptoms or condition as faked); *Id.* at ¶¶ 189, 195, 196, 201 (failing to order diagnostic testing when indicated); *Id.* at ¶¶ 191, 193, 195, 197, 199, 200, 201 (failing to timely send patients to the hospital); *Id.* at ¶¶ 192, 198 (foaming at the mouth and coughing up blood), and; *Id.* at ¶¶ 196, 198, 199, 201 (failing to respond to worsening condition.).

claim against Turn Key has already survived a motion to dismiss, and Plaintiffs must prove the company maintained a pattern and practice of deliberate indifference, discovery into this voluntarily limited number of patients is clearly appropriate and necessary for Plaintiffs case.

**B. The Court Should Compel Defendants' Complete Personnel Files**

Turn Key produced only portions of Defendants' personnel files generated "from the date of their hire through September 30, 2021." **Ex. 1**, p. 30. There is no plausible rationale for this time limitation. Turn Key contracted with Weld County Jail for less than three years, and has not explained at all why it is unduly burdensome to produce the Individual Defendants' entire personnel files as opposed to teasing out the portions it thinks are reasonably close in time to Ms. Cross's death. It offered no explanation regarding its choice of September 30th as the cutoff date (Ms. Cross died on September 5, 2021). This cutoff date is not even relevant to the timeline related to Ms. Cross – her autopsy was not completed until October 25th. The police investigation into her death ended in late November. Turn Key clearly received substantial information about Ms. Cross *after* September 30th.

Defendants' personnel files are also relevant to the *Monell* claim; withholding portions after September 30, 2021 is baseless. As explained in *Everitt v. Brezzel*:

> While a single prior violation may not ordinarily amount to a "policy," the municipality may be liable where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates, but fail to take remedial steps.

It is not possible to deal at the discovery stage of the case with many of the questions presented by *Monell* and its progeny. Suffice it to say that a plaintiff asserting municipal liability under *Monell* is entitled not only to factual information concerning [a state actor's] alleged past violations, but also to information concerning his superiors' knowledge of those violations and what, if anything, they did about them.

750 F. Supp. 1063, 1069 (D. Colo. 1990) (internal quotations and citations omitted); *see Estate of Lillis v. Bd. of Cty. Comm'rs*, Civil Action No. 16-cv-03038-KLM, 2019 U.S. Dist. LEXIS 116247, at *14-15 (D. Colo. July 12, 2019) (applying Tenth Circuit's holding allowing discovery of police reprimands to jail nurses because the reprimands "related simply to the nurses' work as nurses."); *Moya v. City of Clovis*, No. 2:18-cv-00494-GBW-KRS, 2019 U.S. Dist. LEXIS 151381, at *11-12 (D.N.M. Sep. 4, 2019).

Relying on *Everitt*, Judge Boland held in *Estate of Rice v. City & County of Denver* that it was improper to limit discovery of not only pre-incident personnel records, but also post-incident investigations and discipline, finding "that post-incident investigations and discipline are relevant to the issue of policy or custom." No. 07-cv-01571-MSK-BNB, 2008 U.S. Dist. LEXIS 42381, at *23-25 (D. Colo. May 27, 2008). Indeed, courts across the country have held that post-event conduct can evidence the policies, customs, and expectations of an entity.[19]

---

[19] *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *Lee v. Sheriff of Pawnee Cty.*, No. 19-cv-00587-JWB-SH, 2022 U.S. Dist. LEXIS 156861, at *9 (N.D. Okla. Aug. 31, 2022); *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 877-78 (10th Cir. 1993); *Cox v. Glanz*, No. 11-CV-457-JED-FHM, 2014 U.S. Dist. LEXIS 29522, at *29-39 (N.D. Okla. Mar. 7, 2014) (collecting cases), *rev'd in part on other grounds*, 800 F.3d 1231 (10th Cir. 2015); *McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir. 1986); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985); *Gabor v. Dozier*, No. 15 C 8508, 2021 U.S. Dist. LEXIS 237669, 2021 WL 5882205, at *9 (N.D. Ill. Dec. 13,

Further demonstrating obvious relevance, Defendant Nurse Miller actually testified that she believes Weld County revoked her security clearance in January 2023 as a result this lawsuit. **Ex. 10**. The records of these four individual Defendants are unlikely to be voluminous or unduly burdensome to produce, as Turn Key contracted with the Weld County Jail for slightly less than three years. Post-incident personnel records are relevant to this important civil rights case, and there is simply no basis for withholding personnel records from after September 30, 2021.

## C. The Court Should Compel Contract, Budget, and Staffing Information

Plaintiffs seek information about the contract between Turn Key and the County, including contracting process records, staffing and budget reports created pursuant to the contract, and contract performance documents. **Ex. 2**, pp. 7-10.

Judge Domenico already held that Plaintiffs plausibly alleged "that Turn Key delays medical care to inmates to reduce financial costs even at the occasional human cost of their inmates' lives." **Ex. 3**, p. 7. The sought discovery relates to the legitimate allegations that Turn Key's business model creates financial disincentives to offsite medical care even for serious medical conditions – specifically seeking specific reports required by contract or policy, including:

- Contract Administrator Daily Reports;
- Statistical reports generated by Turn Key for review at Medical Advisory Committee (MAC) Meetings;
- Real-time, web-based claims tracking;
- Time sheets, invoices, charge slips, credentialing statements, continuing education and training records, and any other data, records and accounts

2021) (discussing relevancy of post-event evidence to *Monell* claim).

relating to Turn Key's work and performance under the Contract;

- Monthly and daily statistical reports;
- Notifications to the Contract Administrator that an inmate has been admitted to the hospital and daily updates;
- Completed "Offsite Notification forms";
- Turn Key's comprehensive quality improvement activity that monitored the health services provided; and
- All documents and materials related to Turn Key's "financial strength" from 2018 to present, including all records reflecting Turn Key's assets versus liabilities, long-term debt, access to capital, trends in operating revenue, and audited financials.

Turn Key severely limited its response, refusing to produce contractually mandated patient reports; asserting that financial records post-dating Ms. Cross's death are irrelevant; and flatly refusing to produce CQI records, asserting that all responsive records are in the County's custody and control despite its own CQI policy requiring that these records be maintained in a central file. **Ex. 2**, pp. 7-10; **Ex. 5**, p. 6.

Turn Key's winnowing of its search to only those which specifically concern Ms. Cross and refusal to produce financial records post-dating her death is unfounded. The contract documents are about the facility, not individual patients, making them relevant to the *Monell* claims. Plaintiffs allege a policy and custom of understaffing its jails and failing to hospitalize inmates with obviously serious medical needs, and that these policies were adopted and tolerated, at least in part, to maximize profits. ECF 1 at ¶175. Plaintiffs should thus be allowed to explore underbudgeting, understaffing, and refusals to pay for offsite care despite the dangers posed. Turn Key's sudden termination of its contract, disclosures and deposition testimony to date further buttress these allegations. **Ex. 11**; **Ex. 12** at 13:25-15:21.

The *Monell* theories alleged are legitimate and create a corresponding need for discovery. With regard to Turn Key's cap system and the way in which its business model inherently disincentivizes providing inmates with necessary care "to reduce costs, and increase their profits, by reducing 'unwarranted' offsite costs," courts routinely hold that such information can support a *Monell* claim. *See* ECF 1, ¶¶ 175-180; *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014) (private providers "have financial incentives to save money at the expense of inmates' well-being and constitutional rights.").[20]

Nor can there be any doubt of the relevance of discovery aimed at uncovering specific evidence of Turn Key's practices, customs, patterns, and modus operandi with regard to their treatment (or lack thereof) of other inmates to whom they owe a constitutional duty to provide medical care. *See, e.g., Rehberg, supra,* 2011 U.S.

---

[20] *See also, Ceparano v. Suffolk County, Dep't of Health*, S.C.C.F. Med. Unit, 485 Fed. Appx. 505, 508-09 & 509 n.7 (2d Cir. 2012) (reinstating plaintiff's claim of municipal liability based on county's "alleged policy of denying medical care to inmates at the SCCF in order to reduce costs."); *Zikianda v. County of Albany,* No. 1:12-CV-1194, 2015 U.S. Dist. LEXIS 122363, *148-49 (N.D.N.Y. Sept. 15, 2015) (finding evidence sufficient to show inadequate medical care was the result of corporation's "money-saving measures"); *Stewart v. Wenerowicz*, 2015 U.S. Dist. LEXIS 114307, *49-50 (E.D. Pa. Aug. 27, 2015) (concluding plaintiff stated a plausible *Monell* claim because corporate practices included "prioritizing financial considerations over the health and safety of inmates."); *Fields v. Prison Health Servs.*, No. 2:09-cv-529-FtM-29DNF, 2011 U.S. Dist. LEXIS 99244 (M.D. Fla. Sept. 2, 2011) (finding "sufficient evidence" that company's practice of containing costs for emergency medical care caused constitutional violation); *Simmons v. Prison Health Servs.*, No. CV408-239, 2009 U.S. Dist. LEXIS 61757, at *11-13 (S.D. Ga. 2009) (holding that plaintiff plead "a cognizable claim" by alleging "a custom of providing substandard medical care to decrease costs and increase profit").

Dist. LEXIS 58776 (D. Colo. June 2, 2011); *Groark v. Timik*, 989 F.Supp. 2d 378, 389 (D. N.J. 2013) ("Plaintiff pleaded that [defendant's] deliberate indifference to its inadequate customs, policies, and practices caused the violation of his constitutional rights. Therefore, *Monell* discovery is not off limits.").

In a particularly analogous discovery dispute in *Tanner*, Judge Browning ordered the production of other patients' protected health information without redaction, holding that although the other patients had medical conditions not at issue, the documents may indicate patterns in the health care provider's "responses to emergent health situations, their monitoring of inmate health, their reporting mechanisms, and their provision of care," and that "a protective order will sufficiently protect patient information." 405 F. Supp. 3d at 1211-12.

As in *Tanner*, the requested records are highly relevant and proportional to the needs of this civil rights case, and a protective order will adequately protect non-parties' privacy. Plaintiff respectfully requests that the Court compel full responses to Plaintiffs' Requests for Production numbers 14, 18, 20, and 23.

Respectfully submitted this 3rd day of April, 2024

/s/ *Rachel Kennedy*
Rachel Kennedy
Anna Holland Edwards
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
rachel@hheglaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of April, 2024, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

| | |
|---|---|
| Alexandra G. Ah Loy | Matthew J. Hegarty |
| Timothy F. Campbell | David A. Belsheim |
| HALL BOOTH SMITH, P.C. | HALL & EVANS, L.L.C. |
| allieahloy@hallboothsmith.com | hegartym@hallevans.com |
| tcampbell@hallboothsmith.com | belsheimd@hallevans.com |
| *Attorney for Turn Key Defendants* | *Attorney for Weld County Defendants* |

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal