IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-03143-SKC-SBP

THE ESTATE OF AMY LYNN CROSS,
by and through its personal representative,
Jennifer Bauder;
V.C., through his guardian, Jennifer Bauder;
R.C., through his guardian, Jennifer Bauder; and
K.C., through her guardian, Lisa McMullen,

      Plaintiffs,

v.

TURN KEY HEALTH CLINICS, LLC,
TURN KEY HEALTH CLINICIANS, PLLC;
TURN KEY HEALTH CLINICS COLORADO, LLC;
TURN KEY HEALTH MEDICAL COLORADO, PLLC;
ERICA ALCARAZ, individually;
BEATRIZ ORTIZ, individually;
KRISTIN MILLER, individually;
TERESA SIPOLA, individually;
BOARD OF COUNTY COMMISSIONERS, WELD COUNTY; and
SHERIFF STEVE REAMS, in his official capacity;

      Defendants.

---

## ORDER ON PLAINTIFFS' MOTION TO COMPEL DISCOVERY

---

**Susan Prose, United States Magistrate Judge**

      This is a Section 1983 case arising from the death of Amy Lynn Cross while she was in the custody of the Weld County Sheriff. The matter is before this court on Plaintiffs' motion to compel discovery from the Turn Key Health Defendants (collectively referred to as "Turn Key"). ECF No. 76 (the "Motion"). Plaintiffs are the Estate of Amy Lynn Cross, through its personal representative, Jennifer Bauder; and the three minor children of Ms. Cross, V.C., R.C., and K.C.,

each respectively through their guardian (collectively, the "Plaintiffs"). Plaintiffs request two categories of documents from Turn Key: (1) morbidity, mortality and sentinel event reviews (for simplicity, the court will refer to this category as "sentinel event records"); and (2) documents relating to or arising under Turn Key's contract with Weld County.[1] Turn Key opposes the Motion. ECF No. 80 ("Response"). The court did not permit a reply. For the reasons that follow, this court **GRANTS** the Motion.

I.      Background

A.      *Plaintiffs' Fact Allegations*

In denying Turn Key's motion to dismiss, Judge Domenico concisely stated Plaintiffs' factual allegations:

> Amy Lynn Cross was arrested and booked in Weld County, Colorado, on September 3, 2021, for drug-related charges. She died while still in custody on September 5, 2021, from methamphetamine toxicity. Her Estate alleges that Turn Key Health Clinics, LLC—a contractor for the Weld County Jail—provided constitutionally insufficient medical care during her detainment. . . .
>
> Turn Key Health Clinics, LLC is a private health organization that contracts with prisons across the United States to provide medical services to inmates. Doc. 1 at ¶¶ 21-25. In bidding for a contract with Weld County, Colorado, Turn Key lauded its ability to reduce "unwarranted" costs. *Id.* at ¶¶ 177-78. It pointed to its successes in Tulsa, Oklahoma, where it reduced operating costs by cutting down on transferring inmates to emergency rooms by 77% and reducing the days inmates spent in offsite hospitals by 35%. *Id.* After this presentation, Weld County contracted with Turn Key for it to provide its services to Weld County Jail inmates.

---

[1] Plaintiffs also moved to compel the complete personnel files of the individual Defendants (Erica Alcaraz, Beatriz Ortiz, Kristin Miller, and Teresa Sipola, collectively referred to as the "Nurse Defendants"). Turn Key then agreed to produce the portions of those files that it had withheld. Response at 8. Plaintiffs state that the parties are still working on a subset of documents that Plaintiffs had expected to find in the production (performance review records), but that the court need not rule on this category of documents at this time. ECF No. 112. The court accordingly deems the issue concerning personnel files to be moot at this time.

*Id.* at ¶¶ 167, 177-78.

During intake on September 3, 2021, Ms. Cross alerted Turn Key nurses that she had recently taken methamphetamine, but she did not tell them that she had some meth on her person. *Id.* at ¶¶ 42-46. A Turn Key nurse noted Ms. Cross's condition: she appeared "irritable," was likely under the influence of fentanyl, was fidgety, and had an elevated pulse. *Id.* at ¶¶ 46-49. To monitor Ms. Cross's condition, a Turn Key nurse placed her on [a] program for evaluating withdrawal symptoms. *Id.*

The next day, Ms. Cross's condition worsened. *Id.* at ¶¶ 50-54. Deputies called a Medical Code 5 (a medical emergency), and Turn Key nurses came to help Ms. Cross. *Id.* at ¶ 55. At the time, Ms. Cross had an elevated pulse of 152, had difficulty urinating, had chest pains, was fidgeting, and was sweating profusely. *Id.* at ¶¶ 59-64. She was moving too much to allow nurses to perform tests and to catheterize her. *Id.* at ¶¶ 65-72. "People in acute methamphetamine toxicity must be hospitalized for drug induced sedation" because their erratic muscle movements often make it difficult for doctors to treat them. *Id.* at ¶ 40. The nurses characterized Ms. Cross's behavior instead as a "refusal" to cooperate with medical staff. *Id.* at ¶¶ 67-72. Ms. Cross begged to be sent to the hospital. *Id.* at ¶ 68. Instead, Turn Key nurses had deputies take Ms. Cross back to her cell. *Id.* at ¶¶ 78.

Upon being returned to her cell, Ms. Cross told deputies that she was suicidal, which required deputies to do continual checks on her. *See id.* at ¶ 79. Deputies Kendra Betz and Hunter Aslin discussed Ms. Cross's symptoms, saying Turn Key nurses did not believe that some of Ms. Cross's symptoms were "real." *Id.* at ¶ 92. During her shift, Deputy Betz continued to update Turn Key nurses on Ms. Cross's worsening symptoms. *Id.* at ¶¶ 95-102, 131-33. Deputy Betz became increasingly worried that Ms. Cross was not getting adequate care and sought advice from sergeants on how to better help Ms. Cross. *Id.* at ¶¶ 139-42. Their advice was to continue relying on Turn Key nurses. *Id.*

Ms. Cross's symptoms now included, off and on, her spewing some "brown muscussy stuff," foaming at the mouth, heavily sweating, laying on the floor without a shirt to cool down, "possibly choking," having blue fingers, becoming nonverbal to commands and questions, shaking, spasming, and fidgeting. *Id.* at ¶¶ 96, 102, 110-14, 131. Most of Ms. Cross's symptoms throughout the day are symptoms of methamphetamine toxicity, but Turn Key nurses characterized these symptoms differently. *Id.* at ¶¶ 40, 120-23, 131-32. They again concluded that Ms. Cross was fine, that her signs were "normal," that she was just cold, and that she was refusing to cooperate. *Id.* at ¶¶ 122-26, 132. Turn Key nurses agreed that she would not need hospitalization "regardless of how sick she became." *Id.* In their

3

estimation, Ms. Cross was only "acting a fool." *Id.* at ¶ 87.

      Ms. Cross died on September 5, 2021. *Id.* at ¶¶ 157. Deputy Betz called nurses to check on Ms. Cross late on September 4; she by then had low blood pressure (70/52) and shallow breathing. *Id.* at ¶¶ 143-47. Within minutes, Ms. Cross's heart had stopped. *Id.* at ¶¶ 148-53. Nurses called an ambulance and attempted CPR, but Ms. Cross was pronounced dead minutes after paramedics arrived. *Id.* at ¶¶ 148-53, 157.

ECF No. 60 (Order of July 18, 2023) at 2-3. Judge Domenico found that Plaintiffs' factual allegations—taken as true—support a plausible claim against Turn Key under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* at 5.

     B.    The Elements of <u>Monell</u> and Plaintiffs' Fact Allegations that Support a Plausible Claim Thereunder

     Because Judge Domenico's delineation of the law and application thereof to Plaintiff's allegations will guide this court in resolving the present discovery dispute—and should have also guided Turn Key's response to Plaintiffs' request for at least the first category of documents—this court quotes Judge Domenico's analysis at greater length than is perhaps usual:

> The Tenth Circuit—and all circuits who have reached the issue—extends *Monell* liability to private organizations acting on behalf of a municipality. *Dubbs v. Head Starts, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003). *Monell* liability does not attach on a theory of mere *respondeat superior*, however; a private organization must have a policy that "direct[ly] cause[s]" the constitutional violation. *Id.* at 1215-16. For Turn Key to be liable under *Monell*, the Estate must first identify the unconstitutional policy. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019). This allegedly unconstitutional policy can take five forms:
>
>     (1) A formal regulation or policy statement;
>     (2) Informal custom that is "permanent and well settled as to constitute custom usage with the force of law";
>     (3) "[D]ecisions of employees with final policy making authority";
>     (4) A final decision maker's ratification of a decision made by an employee with delegated authority to make such a decision; and
>     (5) A failure to train.

*Id.* (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2020) (internal references omitted)). Next, the Estate must allege that Turn Key's policy caused Ms. Cross to be deprived of her constitutional rights. *Id.* Finally, the Estate must allege that Turn Key was deliberately indifferent to inmates' constitutional rights. *Sherman v. Klenke*, 593 Fed. App'x 580, 590 (10th Cir. 2016); but [see] *Waller*, 932 F.3d at 1284 (saying this element is only required "for claims of inadequate hiring, training, or other supervisory practices"). The Estate satisfies all three elements.

ECF No. 60 at 4-5. *See also Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th

Cir. 2023) (reciting the same types of official policy, noting the fifth category also includes a

failure to supervise, and is subject to the deliberate indifference standard).

Judge Domenico then applied the law to Plaintiffs' allegations:

Taking all the complaint's allegations as true, Turn Key has an unconstitutional policy of delaying inmates' medical care. The Estate hangs liability on three separate theories: a formal policy, an informal custom, and a failure to train. Without reaching the other two theories, I hold that the Estate plausibly alleges that Turn Key maintains a formal policy of delaying adequate healthcare to inmates. The Estate alleges that "Turn Key maintains a custom, practice, and policy of disregarding and minimizing inmates' medical complaints . . . [and] failing to timely send patients to the hospital in order to save money and increase profits." Doc. 1 at ¶ 175. **While the Estate can point to no specific policy where Turn Key avoids hospitalizing inmates, on the complaint it need not.**

* * *

**[C]ourts would be asking too much to require plaintiffs to have located an organization's internal policy "without the benefit of discovery."** *Petty [v. Cnty. of Franklin]*, 478 F.3d [341,] at 348 [(6th Cir. 2007)]. I am not aware of many private organizations in the habit of publishing their damning internal policies in places where potential litigants can retrieve them. The Estate must still have more than an allegation that some policy exists.

The Estate does not rely merely on a conclusory allegation that the policy exists. It buttresses its allegation by identifying eighteen instances where Turn Key employees delayed care resulting in inmates suffering medical complications. Doc. 1 at ¶¶ 184-202 (alleging there were "at least a hundred"). Plaintiffs can plausibly allege unconstitutional policies using prior instances of the defendants' misconduct

even if those allegations stem from nonparties. *Quintana v. Santa Fe Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2021) (three prior instances by nonparties, eight prior instances by the deceased). When identifying these prior instances, the plaintiff must plead "specific facts" like the names of the parties, the circumstances of the claims, and the alleged misbehavior. . . . **These prior instances must also be similar to the plaintiff's claim to plausibly allege an unconstitutional policy**. *Quintana*, 973 F.3d at 1034; *see Connick v. Thompson*, 563 U.S. 51, 62-63 (2011) (rejecting a claim because the other alleged cases were not "similar to the violation at issue here").

The Estate adequately does so. . . . **The Estate does identify . . . at least nine cases with facts similar to Ms. Cross's. *Id.* at ¶¶ 185-87, 190, 193, 195, 198, 200-01.** These cases each involve some variation of the following facts which appear here:

- Turn Key employees accusing inmates of faking their symptoms;
- Non-medical professionals pleading with Turn Key employees to further assist inmates;
- Inmates begging Turn Key employees to take them to the hospital;
- Inmates complaining of symptoms for hours on end;
- Inmates manifesting visible symptoms for hours on end;
- Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; and
- Turn Key employees delaying in hospitalizing inmates leading to their deaths and disabilities.

*Compare id. with id*. at ¶¶ 87, 92; 139-42; 68-71; 82, 136; 46-49, 97, 113-14, 131-32, 147; 43-46. Turn Key argues that none of these cases have reached judgment. But just as complaints are filed for many, even frivolous, reasons, so too are cases dismissed or settled for many reasons other than lack of liability. . . **These cases across the United States paint a plausible picture** that Turn Key delays medical care to inmates to reduce financial costs even at the occasional human cost of their inmates' lives. Doc. 1 at ¶ 201; *see Bailey v. Turn Key Health Clinics, LLC*, No. 20-cv-0561, 2021 U.S. Dist. LEXIS 177310, at *15, *18-*19 (N.D. Okla. Sep. 17, 2021) (Turn Key employees sent the plaintiff to the hospital only after she agreed to pay for her own treatment.). . . .

[A] plaintiff alleging that a provider considered cutting costs to avoid providing constitutionally sufficient care is a "wholly conclusory" "naked assertion." [*Sherman*,] 653 Fed. App'x at 592-93. The Estate more than just "naked[ly] assert[s]" a "wholly conclusory" financial motive, however. **It supports its conclusion by pointing to a statement Turn Key itself made—and marketed**

**itself on—about how it avoids hospitalizing inmates to lower costs**. Doc. 1 at ¶ 177. This allegation is not just conclusory because the Estate support[s] it with Turn Key's own words. . . . **Businesses [sometimes] calculate that they may save money by implementing liability-inducing decisions that cost less than the alternatives.** *See id.* **Turn Key could have made this calculus**. Doc. 1 at ¶¶ 177-78, 201. [The Estate] plausibly alleges that Turn Key has financial motives to maintain a policy of delaying hospitalizing inmates across the country.

ECF No. 60 at 5-8 (emphasis added).

In finding Plaintiffs' *Monell* claim plausible, Judge Domenico further noted that "[t]he complaint points to **three cases where Turn Key delayed medical care resulting in the inmates' deaths**—four including Ms. Cross's. Doc. 1 at ¶¶ 151, 195, 198, 200. **Other cases resulted in alternate "substantial[ly] harm[ful]" medical conditions like paralysis and comas**. *Id.* at ¶¶ 185, 187, 190." ECF No. 60 at 9 (emphasis added). "Turn Key knew **from 2009 to 2019** that delaying in providing inmates' medical treatment could result in substantial harm to those inmates. Doc. 1 at ¶¶ 185-202. As the Estate's complaint plausibly alleges, Turn Key knew the risk that its custom could result in inmates' deaths or disabilities and continued the policy **for ten years** regardless." ECF No. 60 at 11 (emphasis added).[2]

On March 26, 2024, this court held an informal discovery conference on the disputes that are the subject of the Motion. ECF No. 75 (the "Discovery Conference").[3] Consistent with this court's discovery practice standards, the parties submitted discovery statements by email to

---

[2] This court again recognizes that Judge Domenico's order discusses only the *factual allegations*, not facts that have been found based on evidence. But it is the claims and defenses that determine the scope of discovery, and therefore Judge Domenico's reasoning concerning Plaintiffs' allegations directly informs and guides this court's resolution of the parties' discovery disputes.

[3] The court also held a discovery conference on February 20, 2024, but that conference did not concern the present disputes between Plaintiffs and Turn Key. ECF No. 73.

chambers. Turn Key's Response brief incorporates by reference its March 22, 2024 discovery statement. Response at 2.[4] To date, no one has ordered a transcript of the Discovery Conference.

## II.       Legal Standards for Discovery Motions

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).

Relevance under Rule 26(b)(1) is "broadly construed" in relation to discovery, and a request is considered relevant "if there is 'any possibility' that the information sought may be relevant to any party's claim or defense." *Byron-Amen v. State Farm Mut. Auto. Ins. Co.*, No. 21-cv-02364-NYW, 2022 WL 1567563, at *2 (D. Colo. May 18, 2022), *reconsideration denied*, 2023 WL 2632783 (D. Colo. Mar. 24, 2023) (citing *Martensen v. Koch*, 301 F.R.D. 562, 570 (D. Colo. 2014)); *Brackett v. Walmart Inc.*, No. 20-cv-01304-KLM, 2021 WL 1749975, at *3 (D.

---

[4] It is permissible to incorporate by reference a prior discovery statement, but only if doing so does not cause the party's brief to exceed the page limit, and the party attaches the discovery statement to its brief. Here, Plaintiffs attached Turn Key's discovery statement. ECF No. 76-4. But Turn Key exceeds the page limit; its discovery statement was over ten single-spaced pages, and its Response runs 11 pages. In this instance, this court considers the entire discovery statement and Response brief, but going forward the court may strike or not consider any excess pages.

Colo. May 4, 2021) ("[R]elevance is not so narrowly construed as to limit a story to its final chapter, and neither party is entitled to make it impossible for all meaningful parts of the story to be told."). "[T]he party resisting discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under [Rule 26], or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Simpson v. Univ. of Colo.*, 220 F.R.D. 354, 359 (D. Colo. 2004) (quotation omitted).

In considering proportionality, this court "weighs the importance of the discovery to the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Carlson v. Colo. Ctr. for Reprod. Med., LLC*, 341 F.R.D. 266, 274 (D. Colo. 2022) (citing Fed. R. Civ. P. 26(b)(1)). The Advisory Committee Notes to the 2015 Amendments make clear that the party seeking discovery does not bear the burden of addressing all proportionality considerations. Advisory Comm. Notes to Fed. R. Civ. P. 26(b)(1).

Rule 26(b)(2)(C) allows a court to limit discovery on motion or on its own if it determines: (1) the discovery sought is unreasonably cumulative or duplicative, or may be obtained from some other source that is more convenient, less burdensome, or less expensive; (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (3) the proposed discovery is outside the scope permitted by Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C). Also, "[t]he court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden" from an otherwise relevant

discovery request. Fed. R. Civ. P. 26(c)(1). The party seeking such protection "has the burden of proof[.]" *Stroup v. United Airlines, Inc.*, No. 15-cv-01389-WYD-CBS, 2016 WL 7176717, at *3 (D. Colo. Sept. 16, 2016).

III.     *Analysis*

    A.     *Sentinel Event Records*

        *1. Requests for Production ("RFP") Nos. 14, 23*

For the first category of documents at issue—Turn Key's sentinel event records—Plaintiffs first requested these documents only as to the Weld County Jail, during Turn Key's contract period with Weld County:

> **REQUEST FOR PRODUCTION NO. 14**: Produce all mortality reviews, morbidity reports, root cause analyses, sentinel event reports, or any similar type of internal investigations or reviews **relating to any serious injuries or deaths in the Weld County Jail since the time Turn Key started providing medical services in the facility to the present**.

ECF No. 76-1 at 27 (in relevant part; emphasis added). Recognizing that Turn Key's contract with Weld County ended, Plaintiffs later narrowed this request to the three years that Turn Key provided services at the Weld County Jail. Motion at 14 ("the three years Turn Key was the medical provider"). Turn Key responded:

> Objection. This Request is vague, ambiguous, compound, unduly burdensome, and overly broad as to time and scope. The care and treatment at issue in this case occurred at the Weld County Detention Center in September 2021; therefore, **any discovery beyond Weld County Detention Center prior to September 2021 has no relevance** to this lawsuit and would have no probative value over any of the material issues in this case, **nor is any such discovery proportional** to the needs of this case. Moreover, the Weld County Detention Center is not an accredited facility, and Defendant objects inasmuch as this Request is premised upon the false belief that Defendant was required to generate written morbidity and mortality reviews. Finally,

Defendant further objects to this Request as an impermissible fishing expedition and as not being reasonably calculated to lead to the discovery of admissible evidence.

**Subject to and without waiving the foregoing objections,** Defendant states: **Defendant is currently unaware of any documents responsive to this Request** from the Weld County Detention Center, as the Weld County Detention Center is not an NCCHC-accredited facility. Specific to Amy Cross, Defendant conducted an internal sentinel event review following Ms. Cross's death. No written death report was generated arising out of this review. Defendant attempted to meet with Weld County jail officials on or about September 7, 2021, to discuss Defendant's investigative findings. Weld County declined this meeting due to the County's pending Critical Incident Response Team (CIRT) investigation.

ECF No. 76-1 at 27-28 (in relevant part). Turn Key provided this response on June 7, 2023. *Id*. at 33 (certificate of service). Neither side suggests that Turn Key supplemented this response after receiving Judge Domenico's order of July 18, 2023.

Plaintiffs later issued another request for sentinel event records, this time as to the nine inmates whose deaths or substantial injuries under Turn Key's care Judge Domenico found similar enough to Ms. Cross's death to support a plausible *Monell* claim:

**REQUEST FOR PRODUCTION NO. 23**: Produce all mortality reviews, morbidity reports, root cause analyses, sentinel event reports, or any similar type of internal investigations or reviews relating to the following Turn Key patients: Lacee Danielle Marez, Curtis Gene Pruett, Robert Allen Autry, Michael Edwin Smith, James Buchanan, Trillus Smith, Caleb Lee, Angela Yost, and Misty Bailey. If no mortality review exists, please so state and identify the basis for not conducting one.

ECF No. 76-2 at 12 (emphasis omitted). *See* ECF No. 1 ¶¶ 185, 186, 187, 190, 193, 195, 198, 200, 201 (alleging these nine individuals' deaths or substantial injuries under Turn Key's care). Those are the same paragraphs that Judge Domenico cites in his order, finding them similar enough to Ms. Cross's death to plausibly support the *Monell* claim. ECF No. 60 at 7.

On December 29, 2023—several months *after* Judge Domenico issued his order denying Turn Key's motion to dismiss—Turn Key responded:

> Defendant objects to this request for production as vague, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent the documents sought are protected from disclosure by attorney-client privilege, the work product doctrine, and/or were prepared in anticipation of litigation. **The documents sought here, to the extent such may exist, have no probative value whatsoever as they bear no relation to Plaintiff's claims and Defendant's defenses in this litigation. As such, they are wholly irrelevant.** This case involves a death at Weld County. None of the persons referenced above were inmates at Weld County. Further, to the extent Plaintiff seeks "mortality reviews," such documents cannot exist for Michael Edwin Smith, James Buchanan, and Misty Bailey, as those inmates did not die in custody. Finally, to the extent this request seeks production of documents protected from disclosure by HIPAA, 42 U.S.C. § 1320d*, et seq.,* Defendant further objects to production of the same. Finally, Defendant objects to this Request as no more than an improper fishing expedition with no probative value to any of the material issues in this case.

ECF No. 76-2 at 12 (emphasis added).

### 2.   RFP Nos. 14 and 23 are Relevant and Non-objectionable.

This court has no difficulty concluding that the requested sentinel event records are relevant, as this is already plain from Judge Domenico's July 2023 order. Plaintiffs limit their requests to the sentinel event records pertaining to (a) Ms. Cross's death, (b) apparently three other sentinel events in the Weld County Jail while Turn Key provided services there, and (c) the nine individuals whose deaths and substantial injuries Judge Domenico found similar enough to Ms. Cross's to plausibly support the claim.[5] The court thus understands that in addition to Ms.

---

[5] The court understands from Plaintiffs' argument during the March 26, 2024 discovery conference (at 1:54 p.m.) that RFP No. 14 concerns Ms. Cross and three other individuals who died in the Weld County Jail while Turn Key provided services there. *See also* ECF No. 1 ¶ 37 (alleging "three people in jail overdosed on contraband drugs in the week prior to Ms. Cross's

Cross, this category involves sentinel event records for approximately twelve individuals—three who experienced sentinel events at Weld County Jail, and nine who had sentinel events elsewhere.

As for the sentinel event records concerning *Ms. Cross and other inmates of the Weld County Jail* during Turn Key's tenure, Turn Key does not appear to directly address this subset of records. *See* ECF No. 76-4, Discovery Statement (no discussion of RFP No. 14). Turn Key's response to RFP No. 14 asserts that it has looked, and no responsive, pre-litigation documents exist concerning Ms. Cross's death. Turn Key also asserts work-product protection for any responsive documents created after it received Plaintiffs' preservation letter of October 25, 2021 (ECF No. 76-1 at 27). Plaintiffs do not take issue with Turn Key's assertion of work-product protection.

During the Discovery Conference, Plaintiffs' counsel recognized that to her understanding, there are no sentinel event records concerning Ms. Cross's death. The court cannot compel Turn Key to produce documents that do not exist. *Graham v. United States*, No. 21-cv-03053-NYW, 2024 WL 757086, at *4 (D. Colo. Feb. 23, 2024) ("the Court cannot compel [a litigant] to produce what it says does not exist," citing *Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2013 WL 1751850, at *3 (D. Colo. Apr. 23, 2013)).

But Turn Key must produce any sentinel event records concerning other inmates of the Weld County Jail while Turn Key provided services there. As to those individuals, Turn Key does not appear to argue irrelevance or to raise any objections other than HIPAA. Response at

---

incarceration," but not alleging whether they died or were seriously injured).

4-7; ECF No. 76-4, Discovery Statement at 4.[6]

Turn Key's HIPAA objection is overruled. As Plaintiffs note, HIPAA allows for disclosure of protected health information pursuant to court order. Motion at 5-6 n.4 (citing inter alia 45 C.F.R. § 164.512(e)(1)). "In certain limited circumstances, such as with a court order, a person's protected health information may be obtainable without that person's knowledge or consent." *Est. of Lillis v. Bd. of Cnty. Comm.*, No. 16-cv-03038-KLM, 2019 WL 3386471, at *2 (D. Colo. July 26, 2019) (citing 45 C.F.R. § 164.512(e)(1)(I)). In its Response, Turn Key does not address this exception. Indeed, Turn Key's Response does not even mention its HIPAA objection. This court finds that the protective order governing confidential discovery (ECF No. 33) will adequately protect any HIPAA-protected health information contained in the sentinel event records concerning any and all inmates.

This leaves the sentinel event records concerning *the nine individuals from other facilities.* Turn Key recognizes that Judge Domenico has found those allegations similar to Ms. Cross's, but Turn Key argues that "at the 12(b)(6) stage, the court is required to take all factual allegations as true," while "the Court is not required at this stage in litigation and in discovery to merely assume Plaintiffs' unproven, self-serving allegations." ECF No. 76-4, Discovery Statement at 7.

But the scope of relevance for discovery by definition hinges on the claims and defenses *before they are proved*. A primary purpose of discovery is to learn the extent to which the claims

---

[6] To the extent Turn Key argues the other deaths in Weld County are irrelevant, the court disagrees. The record does not reflect any details establishing that these deaths are dissimilar from Ms. Cross's for purposes of relevance to the widespread policy that Plaintiffs allege here.

and defenses are true. This court need not assume that Plaintiffs' allegations are true in order to find the discovery concerning those allegations to be relevant. *See, e.g.*, *Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2011 WL 2180659, at *4 (D. Colo. June 2, 2011) ("there is simply no 'plausibility' threshold which must be crossed before a party is entitled to discovery, unless the claim lacks sufficient plausibility such that it fails to survive a motion to dismiss"). Here, Judge Domenico denied Turn Key's motion to dismiss and concluded that the nine individuals in question allegedly died or were seriously injured in ways that were sufficiently similar to Ms. Cross's death to plausibly support the widespread policy that Plaintiffs allege against Turn Key. Judge Domenico's order in itself suffices for this court to find that RFP No. 23 seeks information that is directly relevant to Plaintiffs' claim.

Moreover, this court also finds persuasive the numerous cases that Plaintiffs cite—including from this District—in which courts have ordered the production of similar, post-incident self-analysis documents as relevant to a *Monell* claim. *See* Motion at 8-11 (citing *e.g.*, *Tanner v. McMurray*, 405 F. Supp. 3d 1115, 1209, 1212 (D.N.M. 2019); *Rehberg*, 2011 WL 2180659, at *1-2, 6 (compelling the defendant city's analyses of potential violations of constitutional rights by its police department)). Turn Key quibbles with the time periods and the extent to which the deaths or injuries in the cited cases were more similar than they are here. Response at 6. The court respectfully disagrees. Turn Key reads Plaintiffs' cited cases too granularly. The important point is that courts have ordered discovery of records concerning other inmates' deaths or serious injuries several times in Section 1983 cases that alleged a widespread policy of denying or delaying care to inmates—without restricting the discovery to only one facility or to deaths or injuries from the same medical condition as the plaintiff.

Turn Key complains that the nine individuals' deaths and injuries occurred over a fifteen-year period in three different states, and thus those events had nothing to do with Ms. Cross's death. This argument ignores that (1) Judge Domenico did not find the temporospatial differences to be significant for similarity to Ms. Cross's death, given the widespread policy that Plaintiffs allege in this case, and (2) Plaintiffs allege that Turn Key has known for at least ten years that its alleged policy carries a substantial risk of serious harm. In these circumstances, this court finds the fifteen-year period is relevant for the sentinel event records that Plaintiffs request in this case.

Turn Key argues (particularly in the Discovery Conference and Discovery Statement) that each of its facilities operates differently, with different policies, procedures, and staff. But this does not make discovery of sentinel event records from those facilities irrelevant where Plaintiffs allege a widespread policy of denying or delaying medical care to increase profits. Turn Key of course can defend Plaintiffs' claim by timely disclosing any documents it wishes to establish differences in policies, procedures, and staff among its facilities—but it cannot avoid Plaintiffs' discovery by simply asserting that it will have defenses.

Turn Key also notes that as to at least one of the nine individuals, Turn Key is only a successor to a separate company (ESW Correctional Healthcare) who provided the care to that individual. Response at 7 n.3. Turn Key argues that ESW is distinguishable from Turn Key because ESW operated in only one county, had no chief medical officer overseeing patient care, and utilized different policies and procedures. *Id*. In the Discovery Conference, Plaintiffs referred to an Oklahoma Secretary of State record indicating that Turn Key still operates as ESW. Plaintiffs did not brief that issue in the Motion. But again, at this point, Turn Key's

16

assertions distinguishing ESW are defenses that Turn Key can raise. They do not deprive Plaintiffs of discovery for their claim.

Nor is this court persuaded by the cases on which Turn Key relies to oppose this discovery. *Estate of Kowalski v. Shrader*, No. 21-cv-00827-NYW, 2022 WL 19422, at *20 (D. Colo. Jan. 3, 2022), for instance, ruled on a motion to dismiss—not a discovery motion—and found that allegations of two other deaths over the span of four or five years before the decedent's were not enough to plausibly establish a widespread practice to support a *Monell* claim. But here, Judge Domenico has already found that Plaintiffs do plausibly state a *Monell* claim, and Plaintiffs allege far more deaths and substantial injuries than the plaintiff did in *Kowalski*. The same is true of *Estate of Reat v. Rodriguez,* No. 12-cv-02531-REB-MEH, 2013 WL 3010828, at *5 (D. Colo. June 17, 2013). Turn Key does not cite any cases that present a similar procedural posture to this case, in which the court has already found certain allegations plausibly support the *Monell* claim, and the plaintiff seeks discovery specific to those allegations.

As for proportionality, this court likewise has no difficulty in finding the requested sentinel event records to be proportional to the needs of this case. The time period requested for these records relating to the Weld County Jail is not long—Turn Key only provided services there for three years. The time period at issue for the nine other inmates is obviously longer than that, but this request concerns only nine inmates, each of whose deaths or injuries led to prior litigation. Turn Key likely had to collect the responsive sentinel event records (to the extent they exist) for the prior cases. And Turn Key does not need to conduct an overall search for all other inmates who died or otherwise suffered sentinel events while in its care. Meanwhile, Plaintiffs' claims allege very substantial loss and damages: they allege Turn Key is liable for the death of a

mother of three minor children. In short, this discovery is not disproportional to the needs of this case.

In its Response brief, Turn Key does not argue that RFP Nos. 14 or 23 are unduly burdensome. A party may object to a request if "the burden or expense of the proposed discovery outweighs its likely benefit." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1238 (10th Cir. 2000) (quoting now Fed. R. Civ. P. 26(b)(1)). But the party resisting discovery has the burden to show that the request is unduly burdensome. *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 209 F.R.D. 208, 213 (D. Kan. 2002). The party raising such an objection typically accompanies their brief with an affidavit or similar evidence describing the time and expense involved to respond to the request. *Id.* (holding that the defendant must "provide sufficient detail and explanation about the nature of the burden"); *Cardenas v. Dorel Juv. Grp., Inc.*, 232 F.R.D. 377, 380 (D. Kan. 2005). Here, Turn Key did not submit any declaration to support a finding of undue burden as to the sentinel event records, and it did not articulate in its briefs why requiring it to collect such documents would be unduly burdensome.

In its Discovery Statement, Turn Key argued that "requiring Turn Key to litigate those [nine] cases here would result in manifest injustice, [and] undue burden and expense." ECF No. 76-4, Discovery Statement at 7. But it did not explain this conclusory assertion, other than to note that there were "no formal finding[s] of facts" or judgments in those cases. *Id*. This is not persuasive. Again, the relevance of this discovery does not depend on Plaintiffs having first proved that their allegations with respect to the nine individuals are true. This court permits discovery if there is "any possibility" that the request concerns information that may be relevant to a party's claim or defense. *See Martensen*, 301 F.R.D. at 570. Turn Key will be able to argue

to Judge Crews that the evidence concerning the other cases is not admissible at trial, but the information concerning these deaths and injuries is nonetheless relevant for purposes of discovery. Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Turn Key's objection of undue burden is unsupported and is therefore overruled.

In short, Turn Key shall promptly and fully respond to RFP Nos. 14 and 23. If Turn Key does not have sentinel event *reports* that are responsive to these requests, it shall nonetheless produce any non-privileged communications relating to Ms. Cross's death and the deaths or serious injuries of the twelve other inmates at issue. This is the relief that Plaintiffs' counsel requested during the Discovery Conference if Turn Key has no sentinel event reports, and Turn Key has not shown it would be objectionable.

    B.    *Documents Relating to or Created Pursuant to Turn Key's Contract: RFP No. 20*

In their second set of requests, Plaintiffs requested the following documents relating to or arising under Turn Key's contract:

**REQUEST FOR PRODUCTION NO. 20**: Produce all documents reflecting or relating to any **communications between any representative of Weld County Sheriff's Office and any representative of Turn Key** relating to the following Reporting required by the RFP, Bid, or policy since January 1, 2020 to the present:

a. Contract Administrator Daily Reports (Weld Defendants 5866-70);

b. Statistical reports generated by Turn Key for review at Medical Advisory Committee (MAC) Meetings as detailed at Weld Defendants 5768, 5841;

c. Real time, web-based claims tracking (Weld Defendants 5773);

d. Time sheets, invoices, charge slips, credentialing statements, continuing education and training records, and any other data, records and accounts relating to Turn Key's work and performance under the Contract (Weld Defendants 5846).

e. Monthly and daily statistical reports as detailed at Weld Defendants 5848-49;

f. Notifications to the Contract Administrator that an inmate has been admitted to the hospital and daily updates (Weld Defendants 5849);

g.  Completed "Offsite Notification forms" as described at TK 2161;

h.  Turn Key's comprehensive quality improvement ["CQI"] activity that monitored the health services provided as required at Weld Defendants 5849; and

i.  All documents and materials related to Turn Key's "financial strength" from 2018 to present, including all records reflecting Turn Key's assets versus liabilities, long-term debt, access to capital, trends in operating revenue, and audited financials. *See* Weld 5777, 5843.

ECF No. 76-2 at 7-8 (emphasis and paragraph lettering added). Turn Key responded:

> Defendant objects to this request for production of documents as vague, compound, unduly burdensome, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. **Defendant further objects to the extent this request seeks production of protected health information of any patients other than Amy Cross** and to the extent the documents sought are protected from disclosure by attorney-client privilege, the work product doctrine, and/or which were prepared in anticipation of litigation. **Subject to said objections and without waiving the same** and to the extent possible, Defendant responds to each subpart of the several distinct subparts of this request for production of documents as follows:
>
> * * *
>
> h.    Defendant objects to Plaintiff's request for "comprehensive quality improvement activity" documents as vague. Subject to said objection and without waiving the same, to the extent any additional documents responsive to this request exist, the same would be in the possession, custody, and/or control of Weld County, as Defendant no longer provides correctional healthcare services to Weld County. Further, please see Weld Defendants 08484-09404 (Contract Administrator Daily Reports).
>
> **i.    Defendant objects to Plaintiff's request for production of documents relating to its "'financial strength' from 2018 to the present" as vague and, to the extent Plaintiff seeks documents post-dating the death of Amy Cross, irrelevant.** There is no evidence that financial considerations played any in role in the death of Amy Cross or that such considerations impact Defendant's delivery of patient care. **Subject to said objections and without waiving the same**, Turn Key designates the deposition testimony of [excerpts of four depositions and certain documents produced by Weld Defendants]

ECF No. 76-2 at 8-10 (emphasis and paragraph lettering added).[7] Turn Key agreed to produce at least *some* of the requested documents for most of the subcategories, and for others, it stated that

---

[7] From the parties' briefs, it appears that Turn Key's objections to subcategories (a)-(g) are not directly at issue. They are as follows:

   a. Please see Weld Defendants 08484-09404, Contract Administrator Daily Reports.

   b. Defendant conducted a diligent search, and no Medical Advisory Committee Meeting minutes were located for the time period specified in this request. Please see Weld Defendants 08462-08471.

   c. Defendant conducted a diligent search and no real-time, web-based claims tracking documents were located with respect to Amy Cross at any period of time. Defendant specifically objects to production of any real-time, web-based claims tracking documents related to patients other than Amy Cross as the same are irrelevant and protected from disclosure by HIPAA, 42 U.S.C. § 1320d, *et seq.*

   d. Defendant objects to the request for time sheets, charge slips, credentials statements, continuing education and training records, any other data, records and accounts relating to Turn Key's work and performance under the contract as vague, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to said object[ion]s and without waiving the same, please see Weld Defendants 08369-08461 (invoices), Weld Defendants 08484-09404 (Contract Administrator Daily Reports), TK002104-002128 (time detail reports), and TK002935-003255 (orientation modules), and TK003333-003872 (educational materials). With respect to time sheets specifically, any such responsive documents, to the extent they exist, are in the possession, custody, and/or control of Weld County, as Defendant no longer provides correctional healthcare services to Weld County.

   e. Please see, Weld Defendants 08484-09404 (Contract Administrator Daily Reports). Defendant has conducted a diligent search and did not locate any additional documents responsive to this request.

   f. Defendant objects to Plaintiff's request for production of notifications to the contract administrator that an inmate has been admitted to the hospital as overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to said objections and without waiving the same, Defendant conducted a diligent search and no responsive documents were located with respect to Amy Cross at any point in time.

   g. Defendant has conducted a diligent search for documents responsive to Plaintiff's request for production of "Offsite Notification forms" relating to Amy Cross and no responsive documents were located at any point in time. To the extent Plaintiff seeks similar documents related to patients other than Amy Cross, Defendant objects to the

(subject to its objections), it had no responsive documents other than documents that had already been produced.

In the Motion, Plaintiffs take issue with Turn Key's objections to this request:

Turn Key severely limited its response, refusing to produce contractually mandated patient reports; asserting that financial records post-dating Ms. Cross's death are irrelevant; and flatly refusing to produce CQI records, asserting that all responsive records are in the County's custody and control despite its own CQI policy requiring that these records be maintained in a central file.

Motion at 18 (citing the discovery response and Plaintiffs' Exhibit 5, Turn Key's "Continuous Quality Improvement [CQI] Program" policy, filed under restriction at ECF No. 77-2). Thus, the Motion focuses primarily on Turn Key's objections to producing (1) any information relating to anyone other than Ms. Cross and (2) information post-dating her death.

Turn Key responds that the Motion is

an inaccurate picture of Turn Key's document production and its position regarding further discovery of certain financial and contract documents. Turn Key has already produced over 4,700 pages of documents, including certain financial and contractual documents, and Weld County has produced thousands of pages of documents which Turn Key identified as responsive to Plaintiffs' requests. As Plaintiffs are well aware, Turn Key no longer operates in the Jail and Weld County is the custodian of many of the records governing the Turn Key/Weld County relationship.

Response at 8. Turn Key spends little time on its objections and instead focuses largely on the parties' dispute concerning search terms and document custodians for this request. Response at

---

production of the same as they are not reasonably calculated to lead to the discovery of admissible evidence and are protected from disclosure by HIPAA, 42 U.S.C. § 1320d, *et seq.*

9-10.[8] Turn Key argues that Plaintiffs' proposed search terms for RFP No. 20 "will yield an exceedingly large number of documents which will then, at great cost, have to be reviewed for privileged materials by counsel for Turn Key." Response at 9-10. Although the Motion does not discuss the search terms and custodians, Plaintiffs' counsel did note in the Discovery Conference that the parties were still conferring on these issues at the time.

Thus, on the one hand, the court has a Motion that focuses on objections to RFP No. 20, and a response that, while it does not waive the objections, largely focuses instead on search terms and custodians. The court is left with the impression that when Plaintiffs filed the Motion on April 3, 2024, the parties simply gave up on their ongoing efforts to agree upon search terms and document custodians. This does not comply with the spirit of the Uniform Civil Practice Standard for discovery disputes, which in this court's view contemplates that the parties must *fully* confer before raising a discovery dispute. *See* D.C.COLO.MJ § VI.2 ("Parties or counsel must meet and confer in "good faith" in accordance with D.C.COLO.LCivR 7.1(a). . . . Parties should discuss their respective positions in detail and provide a legal and factual basis for each position and any compromise position that would be acceptable"). *See also Jones v. Woodrow*, No. 1:22-cv-00545-CMA-SBP, 2024 WL 3540353, at *5 n.4 (D. Colo. July 25, 2024) ("this court's practice standards requir[e] full conferral before raising a discovery dispute with this court") (cleaned up). Normally, the court would return the issues on RFP No. 20 to the parties for full conferral. But in this case, six months have elapsed in the meanwhile. In this instance only,

---

[8] Turn Key also refers to the parties' negotiations of search terms and custodians for RFP No. 6, but that request is not briefed in the Motion. If the parties have not resolved that dispute, they shall promptly complete their conferral.

the court will not require the parties to complete their conferral.

### 1.   Turn Key's Objections

"Having been dragged reluctantly into the dispute, the court's objective is to enter a[n] . . . order that is fair to both sides and reasonable in light of the objectives outlined in Rule 1." *Stroup v. United Airlines, Inc.*, No. 15-cv-01389-WYD-CBS, 2016 WL 7176717, at *4 n.11 (D. Colo. Sept. 16, 2016). The court first resolves the objections that Turn Key raised in its response to RFP No. 20, because although Turn Key's counsel represented during the Discovery Conference that Turn Key has produced all responsive documents for this request, counsel did not explain whether its production to date is limited by its objections—and its discovery response states that Turn Key responded subject to and without waiving its objections.

Turn Key's objection concerning protected health information of persons other than Ms. Cross is overruled for the same reasons stated above on RFP Nos. 14 and 23. The objection to producing documents that do not refer or relate specifically to Ms. Cross is also overruled. Plaintiffs' claim alleges a widespread policy, not a policy specific to Ms. Cross.

Likewise, Turn Key's objection to producing documents that post-date Ms. Cross's death is also overruled. Turn Key argues that documents created after Ms. Cross's death are irrelevant because subsequent incidents "cannot provide evidence [that] Turn Key was on notice of a constitutional deficiency in *training*." Response at 10 (citing *Waller*, 932 F.3d at 1286). It is not at all plain to this court that *Waller's* holding concerning *subsequent incidents* and failure to train claims even applies to this request. Plaintiffs are only requesting subsequent documents that arose under or related to Turn Key's ongoing contract with Weld County.

But the court does not reach that question because Plaintiffs' claim is clearly not limited

to a failure to train. As noted above, Plaintiffs also claim that Turn Key had both a formal policy and informal custom of delaying or denying outside care to inmates to increase Turn Key's profits. Turn Key does not explain why the contract-related documents post-dating Ms. Cross's death would be irrelevant to the policy and custom portions of Plaintiffs' claim. It is Turn Key's burden to show why this discovery would be irrelevant or otherwise objectionable (*see, e.g.*, *Horizon Holdings*, 209 F.R.D. at 213), and it has not done so. As such, the court overrules Turn Key's objection to producing documents responsive to RFP No. 20 that post-date Ms. Cross's death. The time period for Turn Key's production to RFP No. 20 shall be the entire time period that Turn Key held the contract with Weld County.

As for Turn Key's assertions that it does not have responsive documents for some of the RFP No. 20 subcategories, or that they would be in Weld County's possession, custody, and control, it is unclear whether this response is subject to Turn Key's general objections as to the time period and protected health information of non-parties. In particular, Plaintiffs dispute the veracity of Turn Key's assertion that it has no "CQI" documents to produce, and that if they exist, such documents would be in Weld County's possession, custody and control. Turn Key's CQI policy does state in relevant part that "CQI meeting minutes are documented and retained for reference," and the "Committee chairperson shall ensure that the CQI report is distributed to membership and shared with health staff. Copy of the report will be maintained in a central file." ECF No. 77-2 at 4, 6. And Turn Key's response to subcategory (h) does not state that it actually searched for any CQI documents.

Turn Key shall supplement its response to each of the subcategories of RFP No. 20—even those for which it stated it had no responsive documents——to ensure that it has completely

responded as to documents within its possession, custody, or control. Turn Key does not, however, need to re-produce documents that it has already produced.

### 2.   Search Terms and Document Custodians

This leaves the parties' dispute concerning search terms and document custodians for RFP No. 20. During the Discovery Conference, Plaintiffs' counsel stated that the parties were continuing to work together on those questions and requested the court enter an order requiring the parties to agree on a number of custodians and search terms by a date certain, and for production to occur by a date certain. But Plaintiffs' counsel did not argue either what number of custodians or search terms would be reasonable, or identify any specific custodians or search terms.

After the conference, Plaintiffs proposed a list of seventeen search terms and several document custodians for RFP No. 20. ECF No. 80-2 at 1-2 (April 1, 2024 email). The court focuses first on the search terms and will discuss the document custodians below. Turn Key accepted ten of the search terms and added a restriction of proximity to "Weld" or "WCJ." It rejected the other seven terms without much explanation. *Id*. at 4 (April 2, 2024 email). The next day, Plaintiffs replied and did not object to Turn Key's proposal for the search terms. ECF No. 80-3 at 1 (April 3, 2024 email).

Turn Key's revision appears to be a reasonable compromise of the parties' respective concerns to obtain all responsive documents without also generating an excessively large number of unresponsive documents. Turn Key's proposal is a reasonable approach to locating the relevant information without being disproportional to the needs of the case or imposing an undue burden. The court therefore approves Turn Key's proposed search terms for RFP No. 20:

1. "CAP fund report
2. "outside medical cost"
3. "reconciliation report"
4. "Matthew Elbe"
5. "Invoice WLD"
6. "Matthew Turner"
7. "Kevin Halloran"
8. "Rob Turf"
9. "Michael Knee"
10. "Contract administrator daily report"

*Each of those terms shall be limited to within ten words from "Weld" or "WCJ."*

As for document custodians, Turn Key and Plaintiffs agreed to all but two of the individuals whom Plaintiffs suggested. ECF No. 80-2 at 1, 2. The exceptions are Jennifer Belcher and Dustin Owens. Ms. Belcher is Turn Key's director of human resources (Response at 9), and Turn Key argues it is unlikely that her emails would include responsive documents. ECF No. 80-2 at 4. Plaintiffs reply that a document produced by Weld County reflects that Ms. Belcher sent "Weld Cap Reports" to Mr. Elbe. ECF No. 80-3 at 1. Plaintiffs suggest limiting the search of Ms. Belcher's emails to messages with Weld recipients. The court finds Plaintiffs' position with respect to Ms. Belcher as a document custodian for this request more persuasive than Turn Key's position. Ms. Belcher's communications likely contain relevant information and including her as a document custodian—so long as the search of her emails (or other communications) is limited to communications with Weld County recipients—is not disproportional, unduly burdensome, or otherwise objectionable.

As for Mr. Owens, the court understands from the Discovery Conference that Mr. Owens is the former Turn Key administrator for the Weld County Jail. Both parties recognize that Turn Key had already searched his computer or his emails once, apparently for disclosures or other

discovery requests. Turn Key proposes to add Mr. Owens' email address to the search parameters but objects to searching his emails and computer again. ECF No. 80-2 at 4. Turn Key says the search was exhaustive, but Turn Key did not inform the court of the scope of its prior search of Mr. Owens' emails and how it compares to RFP No. 20. The parties do not dispute that Mr. Owens' communications likely include responsive documents, and without more specific details of the first search, the court does not find that a second search would be disproportional, unduly burdensome, or otherwise objectionable. Mr. Owens is an appropriate document custodian for this request. Accordingly, the court finds the following document custodians for RFP No. 20:

1. April Farmer
2. Jon Echols
3. Junod Flint
4. Lauren Smith
5. Jennifer Belcher, limited to her communications with Weld County officials and employees
6. Dustin Owens

*See* ECF No. 80-2 at 4; ECF No. 80-3.

Turn Key shall promptly use the above search terms and document custodians to supplement its response to RFP No. 20.

IV.   *Conclusion*

Consistent with the foregoing, the court GRANTS Plaintiffs' motion (ECF No. 76) to compel discovery. Turn Key shall supplement its responses and productions to RFP Nos. 14, 20, and 23 **by November 8, 2024** or confer with Plaintiffs to extend that date if necessary.[9]

---

[9] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after

DATED: October 8, 2024                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").